**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON**

**UNITED STATES OF AMERICA**

**v.                                          CRIMINAL NO. 2:23-cr-00176**

**TIMOTHY BRIAN JACKSON**

## UNITED STATES SENTENCING MEMORANDUM

Comes now the United States of America, by Jeremy B. Wolfe, Assistant United States Attorney, and submits this memorandum in support of the United States' position on sentencing issues.

## PSR OBJECTIONS

Defendant maintains two objections to the pre-sentence investigation report ("PSR"). First, he objects to the PSR's inclusion of a two-point enhancement for possession of a firearm pursuant to U.S.S.G. §2D1.1(b)(1). Second, he objects to the PSR's attribution of a four-point enhancement for knowingly misrepresenting or marketing fentanyl as another substance pursuant to U.S.S.G. §2D1.1(b)(13). Both enhancements are properly applied, and defendant's objections should consequently be overruled.

The Sentencing Guidelines provide for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. §2D1.1(b)(1). As the commentary explains, "[t]he

enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id*. at cmt. n. 11(A). The burden first belongs to the United States, who must "prove by a preponderance of the evidence that the weapon was possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." *United States v. Manigan*, 592 F.3d 621, 628-29 (4th Cir. 2010) (internal quotation omitted). In meeting this burden, it is not necessary to prove "precisely concurrent acts such as a gun in hand while in the act of storing drugs" *Id*. at 629 (internal quotations omitted). Instead, circumstantial evidence and proof of constructive possession of the firearm will suffice. *Id*. The United States "must at least prove a temporal and spatial relation linking the weapon, the drug trafficking activity, and the defendant." *United States v. Bolton*, 858 F.3d 905, 912 (4th Cir. 2017).

Once the initial burden is cleared, a defendant may avoid the enhancement by showing that the link between his drug trafficking activities and his possession of the firearm is "clearly improbable." *Id*. This may be done by presenting "circumstantial evidence, such as the type of weapon involved and its location or accessibility." *Id*.

2

"[C]ourts agree that handguns are more likely to be connected with drug trafficking than long guns." *Id*. Indeed, handguns are considered to be a "tool of the trade" for drug dealers. *Manigan*, 592 F.3d at 629-30. As such, "a sentencing court might reasonably infer, in the proper circumstances, that a handgun seized from the residence of a drug trafficker was possessed in connection with his drug activities." *Id*. at 630.

Strong links are present between the gun, the defendant, and the defendant's drug distribution activities. Defendant does not dispute his possession of the firearms in question or his control over the premises where they were found. PSR at *35. Instead, he contests the connection between the guns and his drug activities. *Id*.

On August 29, 2022, at an apartment on Spring Street in Saint Albans, West Virginia, investigators executed a search warrant. Within the main upstairs bedroom, investigators seized two loaded pistols along with numerous pills suspected to contain fentanyl and digital scales. PSR at ¶ 33. Some of those pills have been confirmed by a laboratory to contain fentanyl and other controlled substances. *Id*. at ¶ 36. A substantial quantity of pills and powders containing fentanyl were also found in the other upstairs bedroom. *Id*. at ¶ 32.

Defendant's connection to the apartment is very strong. He had rented the apartment for several years. ECF 26 at *11, ¶ 1. While it was not his full-time residence, he did spend a significant amount of time there engaging in illegal activities. He put out trash for collection that had come from the apartment on several occasions, PSR at ¶¶ 9, 14, 16, 21, and the extensive nature of the pill-manufacturing operation, especially the equipment that he had accumulated relative to that operation, speaks to his involvement with the premises. See *Id*. at ¶ 35. He was even located and arrested in the parking lot associated with the apartment on the date of the search warrant execution. *Id*. at ¶ 27.

The link between the apartment where the two pistols were recovered and defendant's drug trafficking enterprise is self-evident. Defendant was using the apartment in Saint Albans as a workshop for making pills containing fentanyl and similar controlled substances. ECF 26 at **11-12. In total, investigators seized over 10,000 pills from the apartment, many of which contained fentanyl. PSR at ¶ 41.

The two firearms located in the upstairs main bedroom were loaded, and they were pistols. These firearms were possessed in the same place, at the same time, and proximate to the other evidence of defendant's drug trafficking operation. These loaded

4

pistols could have easily been retrieved by defendant in the event of an attempted robbery of his drugs or drug money, and he could have easily accessed them as he traveled outside the apartment for illegal purposes such as delivering manufactured pills to the post office. If he was resting in the bedroom, he could readily grab either pistol and it use it to repel a would-be burglar. The fact that these pistols were loaded, and seized from the main bedroom of the apartment, which served as the focal point of defendant's drug activities, merits application of the two-point enhancement. *See Manigan*, 592 F.3d at 632 (enhancement applied and upheld on the basis of two pistols seized from a shoebox in the bedroom of a house that the court characterized as the "focal point" of the defendant's drug transactions when no drugs were seized from inside the house, but some drugs were located within a vehicle on the property and several drug transactions had taken place just outside during the investigation).

Defendant claims that "no individuals were aware of his possession of the contraband" in an apparent attempt to distance the firearms from his illegal activities by asserting the lack of a need to defend himself or his drugs. *Id*. at *35. This unsupported statement ignores the reality that defendant was discarding numerous pills in the trash on a weekly basis, and that he had placed pills in the mail on at least one occasion. There

5

was opportunity for others to learn of his operation in the Spring Street apartment, just as law enforcement officers were able to do. Even still, "a sentencing court faced with whether to apply the weapon enhancement is entitled to take reasonable account of the settled connection between firearms and drug activities." *Manigan*, 592 F.3d at 629. That inference, which is strong in this case given the close ties between the firearms and the other drug-related evidence in that apartment, is not supplanted by defendant's self-serving statement. Defendant chose where to store these two pistols, and it happened to be near a large portion of his drugs and his drug proceeds. His actions speak louder than his words.

Defendant also possessed firearms at his primary residence in South Charleston, West Virginia. When investigators searched that home on August 29, 2022, they located three additional firearms along with additional pills containing fentanyl. PSR at ¶ 38.

In sum, defendant possessed firearms at two locations in connection with his drug trafficking activities and in direct relation to the offense of conviction. Defendant has not shown that the link between his drug dealing and his possession of these firearms is clearly improbable. The two-point enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) is properly applied.

The Sentencing Guidelines also provide for a four-level enhancement "[i]f the defendant . . . knowingly misrepresented or knowingly marketed as another substance a mixture or substance containing fentanyl or a fentanyl analogue." U.S.S.G. §2D1.1(b)(13). A "fentanyl analogue," for purposes of this enhancement, includes "any substance . . . whether a controlled substance or not, that has a chemical structure that is similar to fentanyl." U.S.S.G. §2D1.1(c), Note (J).

Defendant manufactured thousands of pills in his Saint Albans apartment. He "pressed and imprinted [them] with 'M30' markings to make them look like legitimately-manufactured 30mg Oxycodone pills." ECF 26 at *11, ¶ 2. Defendant acquired the powders, including fentanyl powder, and the necessary equipment for the express purpose of "creat[ing] pills that appeared to be legitimate Oxycodone 30mg pills, but which in fact contained fentanyl or similar substances." *Id*. at **11-12, ¶ 3. On August 29, 2022, investigators seized various pieces of equipment from defendant's apartment that he used to create counterfeit Oxycodone pills, including at least 23 punches marked "M" and "30". PSR at ¶ 35. The very act of possessing the "M30" punches, which defendant acquired from China (ECF 26 at *11, ¶ 3), is illegal under federal law. *See* 21 U.S.C. § 843(5).

7

Defendant knew that the pills he created contained fentanyl or a similar substance. A cell phone seized from defendant on August 29, 2022, contains various text message conversations between defendant and a suspected fentanyl source in China. PSR at ¶ 28. These messages were sent and received between October 1, 2021, and July 14, 2022. For example, defendant says "[f]entanyl is very popular in my area. Do you carry this or know of a company that does?" *Id*. On April 8, 2022, defendant asks "[w]hat is the quote for 100mg and 1kg of fentanyl?" *Id*. at ¶ 29. The other party quotes defendant a price in response. *Id*. Defendant then asks "[w]hat is the maximum dosage?" *Id*. The other party responds by telling defendant that "[t]wo milligrams can kill adults," and defendant acknowledges. *Id*. Defendant has also admitted in a signed Stipulation of Facts to "acquiring fentanyl powder from a source outside the United States." ECF 26 at*11, ¶ 3.

As another district court has noted, placing an "M30" imprint on a pill containing another substance is itself a knowing misrepresentation. *United States v. Marion*, 648 F.Supp.3d 1048, 1053 (N.D. Indiana 2022).

> "Prescription drugs have coded imprints or markings to identify them. The very act of counterfeiting such pills as mimics to Oxycodone, particularly when [the defendant] knew they were fentanyl . . . qualifies as a

8

knowing misrepresentation on his part. They were marketed and represented—as any other product would be deemed marketed as it is labeled once put into the stream of commerce—as prescription Oxycodone for months, though [the defendant] knew they were fentanyl." *Id.*

Defendant intended to distribute the pills that he manufactured, including the thousands of pills that were seized from his apartment on August 29, 2022. ECF 26 at *12, ¶ 5. He also placed some of his pills into the stream of commerce when he placed a package containing several hundred such pills into the United States mail on August 9, 2022. Investigators recovered numerous blue tablets marked with "M" and "30" from inside the package. PSR at ¶ 24. These pills ultimately contained Protonitazene as opposed to fentanyl. *Id.* at ¶ 25. Nevertheless, according to the probation officer's conversation with a Drug Enforcement Administration chemist, Protonitazene has the "chemical makeup" of fentanyl and is actually much stronger than fentanyl. Therefore, it should be considered a "fentanyl analogue."

In conclusion, the four-point enhancement is properly applied. Defendant knew that the pills he was creating contained fentanyl or a similar substance, such as Protonitazene or

Butonitazene. The very act of him using illegal punches to imprint those pills with "M" and "30" is a misrepresentation. In essence, he was misbranding the pills and creating the expectation in the ultimate consumer of those pills that the pills were legitimate Oxycodone when, in fact and as defendant well knew, they did not. There would be no other conceivable purpose, other than misrepresentation, for a defendant to take the risk of acquiring illegal punches from China just to put "M30" imprints on pills. In fact, defendant has admitted to imprinting his pills with "M30" markings in order to make them "look like legitimately-manufactured 30mg Oxycodone pills." ECF 26 at p. 11, ¶ 2.

## **SENTENCING FACTORS**

This is not a typical drug case. The statute of conviction, 21 U.S.C. §841(a)(1), is surely well-known to this Court. The facts underlying defendant's criminal conduct, however, are anything but common. Defendant did not simply possess fentanyl. Instead, he constructed a functioning laboratory capable of churning out thousands of pills containing fentanyl or similar substances. Indeed, investigators seized over 10,000 pills that defendant created in his apartment-turned-workshop.

These pills are dangerous, as communities across the country have learned the hard way. As one district court has noted, "four

out of ten fentanyl-laced counterfeit prescription pills analyzed in 2021 contained a potentially lethal dose of fentanyl." *Marion*, 648 F.Supp.3d at 1056, fn. 5 (citing United States Dept. of Justice (DOJ) & United States Drug Enf't Admin. (DEA), *One Pill Can Kill: Fake Pills Fact Sheet* (2021)). As defendant's Chinese source indicated, two milligrams of fentanyl can constitute a lethal dose. PSR at ¶ 29. The DEA agrees with that assessment, and notes that two milligrams is a quantity so small that it can rest upon the tip of a pencil. United States Drug Enf't Admin. (DEA), *What Every Parent and Caregiver Needs to Know About Fake Pills* (September 2022), available at https://www.justice.gov/d9/2022-11/DEA-OPCK_Parent%20flyer_V5.pdf (last accessed May 21, 2024).

As would be expected given the deadly nature of fentanyl, small round pills containing fentanyl but marked with "M" and "30" are known to cause overdoses. *See United States v. Rodriguez*, 2023 WL 6457800 at *1, 3:23-cr-00016 (W.D. Va, Charlottesville Division 2023) (defendant gave 1.5 such pills to an individual who passed out and died); *See also United States v. Perez*, 2022 WL 3701174 at *2, 2:22CR00006-002 (W.D. Va, Big Stone Gap Division 2022) (one of the purchasers of "M30" pills containing fentanyl overdosed).

Needless to say, fentanyl is deadly. But it is even more deadly to those who do not know they are ingesting fentanyl.

Defendant's clear intention was to mask the true nature of his pills and to hide from his customers the fact that they contained fentanyl — a substance he knew was deadly. As such, his subterfuge made his pills even more dangerous.

Defendant was courting disaster by manufacturing so many deadly pills. But for the intervention of law enforcement, over 10,000 such pills would have made their way out onto the streets. Also, if the nearly $80,000 in cash seized from defendant's apartment is any indication, this was a lucrative enterprise.

The deadly nature of these pills and the extensive nature of defendant's pill manufacturing enterprise speaks to the seriousness of the offense and the need for just punishment. These factors also speak to the need to deter defendant and others from this course of action.

This case is unique. The undersigned is aware of no similar case ever occurring within this district. As such, it presents a unique opportunity to deter others from engaging in pill manufacturing operations before this becomes a trend within the district and elsewhere. In this case, deterrence of others is paramount.

The community must be protected from the flow of these deadly pills, and the need for protection against local pill press operations is even more compelling.

**SENTENCING RECOMMENDATION**

The properly calculated advisory Guideline range in this case is 168-210 months. Defendant's offense was serious, and the grave danger that it brought to the community should be answered with a just sentence. Had defendant simply possessed the quantity of fentanyl involved in this case, with the intent to distribute it, he would be looking at a mandatory minimum sentence of 120 months. What makes this case uniquely dangerous, and defendant's conduct uniquely serious, is the fact that he turned fentanyl powder into pills that mimic legitimate 30 milligram Oxycodone pills. That factor makes this case exceptional in terms of its danger to the community and the need for protection as well as deterrence. As such, that factor merits separate consideration. In other words, defendant should not simply receive the sentence that he would otherwise get if he had committed a traditional violation of 21 U.S.C. § 841(a)(1). He was not just a dealer, he was also a manufacturer.

West Virginia has struggled with the plague of opiate addiction for several years. During that time, far too many lives have been claimed by opiate-related overdoses. Many of those overdoses resulted from fentanyl ingestion. As such, fentanyl prosecutions are important, and this Court has seen many such cases in recent years. But this district does not often house large-

13

scale fentanyl pill manufacturing operations like this one. In fact, this may be the first. Defendant's exceptional conduct needs to be condemned and deterred in the strongest terms possible. This is a landmark case in law enforcement's efforts to protect the community from the dangers of fentanyl, and a strong sentence will serve as a stark warning to anyone else who may consider entering into the business of creating fentanyl pills.

Defendant should receive a sentence at the top of the Guideline range, to be followed by five years of supervised release.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

By:

/s/Jeremy B. Wolfe
JEREMY B. WOLFE
Assistant United States Attorney
WV State Bar No. 11952
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
E-mail: jeremy.wolfe@usdoj.gov

**CERTIFICATE OF SERVICE**

It is hereby certified that the foregoing "UNITED STATES SENTENCING MEMORANDUM" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing on this 24th day of May, 2024, to:

    Rico Moore, Esq.
    441 Rockaway Road
    Charleston, WV 25302
    E-mail: rico@attorneyricomoore.com

    /s/Jeremy B. Wolfe
    JEREMY B. WOLFE
    Assistant United States Attorney
    WV State Bar No. 11952
    300 Virginia Street, East
    Room 4000
    Charleston, WV 25301
    Telephone: 304-345-2200
    Fax: 304-347-5104
    E-mail: jeremy.wolfe@usdoj.gov