IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.                                              CRIMINAL NO. 2:23-cr-00176

TIMOTHY BRIAN JACKSON

### UNITED STATES SUPPLEMENTAL SENTENCING MEMORANDUM

Comes now the United States of America, by Jeremy B. Wolfe, Assistant United States Attorney, and submits this memorandum in response to the defendant's motions for safety valve relief (ECF 31-1) and a downward departure due to coercion (ECF 31-2) as directed by Order of this Court (ECF 32).

On April 22, 2024, the probation officer prepared a draft pre-sentence investigation report ("PSR") that did not assign a two-level reduction for "safety valve" relief pursuant to U.S.S.G. §§ 2D1.1(b)(18) and 5C1.2 or recommend similar relief pursuant to 18 U.S.C. § 3553(f). Defendant did not object to these determinations on or before May 6, 2024, as required by Federal Rule of Criminal Procedure 32(f)(1) and this Court's Order entered on March 12, 2024. ECF 29. Instead, he filed a motion (ECF 31-1) on May 28, 2024, asserting eligibility for safety valve relief pursuant to 18 U.S.C. 3553(f) for the first time.

For the following reasons, the United States opposes the relief sought by defendant in both of his motions.

Safety Valve

Defendant's bid for safety valve relief should be denied on procedural grounds as being untimely made, pursuant to Federal Rule of Criminal Procedure 32(f)(1) and this Court's Order (ECF 29).

However, as to the merits of defendant's claim, he is ineligible for such relief for two reasons: 1) he possessed firearms in connection with the offense of conviction; and 2) he has not presently satisfied the requirement that he "not later than the time of the sentencing hearing . . . truthfully provide[] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(2)&(5).

Defendant must prove by a preponderance of the evidence that he meets all the requirements for safety valve relief, whether that relief is sought pursuant to statute or the Sentencing Guidelines. *United States v. Bolton*, 858 F.3d 905, 913 (4th Cir. 2017) (discussing U.S.S.G. §5C1.2); *United States v. Aidoo*, 670 F.3d 600, 605 (4th Cir. 2012) (discussing 18 U.S.C. § 3553(f)). "[W]here the government opposes application of the safety valve, a defendant cannot carry his burden of proof without presenting

some kind of evidence."[1] *Aidoo*, 670 F.3d at 607 (full and honest disclosure requirement set forth in § 3553(f)(5)); *See generally Bolton*, 858 F.3d at 914 (defendant's discredited witness "failed to show by a preponderance of the evidence that the firearms were not connected to his drug distribution"). As defendant correctly notes, imposition of a two-level enhancement for possession of a firearm pursuant to U.S.S.G. §2D1.1(b)(1) does not necessarily foreclose safety valve relief due to the differing standards of proof applicable to the two provisions. *Bolton*, 858 F.3d at 914.

Nevertheless, the evidence that currently exists in the record clearly establishes that defendant's possession of the two

---

[1] Defendant should be mindful that if he "falsely denies, or frivolously contests, relevant conduct that the court determines to be true" he could lose his reduction for acceptance of responsibility. U.S.S.G. §3E1.1, cmt. n. 1(A). Statements made by a defendant after he has entered a guilty plea, which are designed to minimize his role in the offense, can justify withholding the reduction. *See United States v. McKenzie-Gude, 671 F.3d 452*, 457, 463 (4th Cir. 2011) (defendant who pled guilty to possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d) made "totally incredible" claims to his probation officer that he had "never assembled or detonated any explosive devices"); *United States v. Patterson*, 755 Fed.Appx. 238, 241 (4th Cir. 2018) (defendant attempted to minimize the severity of his conduct during his allocution at sentencing and denied that he routinely or severely beat the victim contrary to the evidence in the record); *United States v. Carr*, 590 Fed.Appx. 245, 246 (4th Cir. 2015) (defendant made statements during allocution denying any intent to harm the victims and denying that his crimes were deliberate.) Some of defendant's current arguments could give rise to this risk.

3

loaded pistols seized on August 29, 2022, from a bedroom in his Saint Albans, West Virginia apartment was in connection with the offense of conviction. Defendant has been convicted of the offense of Possession with Intent to Distribute 400 Grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl, in violation of 21 U.S.C. § 841(a)(1), occurring on or about August 29, 2022, as charged in the single-count Indictment. During a search of defendant's apartment on August 29, 2022, investigators found two loaded .40 caliber pistols in a bedroom along with a digital scale, United States currency, and several fentanyl pills. PSR at ¶¶ 33, 35, 36. Digital scales are recognized as evidence of drug distribution. *See United States v. Harris*, 31 F.3d 153, 157 (4th Cir. 1994). In another bedroom on the same floor, investigators found thousands more pills containing fentanyl and other substances along with an additional amount of United States currency. *Id*. at ¶¶ 32, 36. In the basement of the apartment, investigators found additional drug-related evidence to include multiple punches and dies designed to imprint "M" and "30" upon pills, pill press machinery, and an electronic powder mixer. *Id*. at ¶ 35. In total, investigators seized over 10,000 pills containing fentanyl or related substances from the apartment along with nearly $80,000 in United States currency. *Id*. at ¶ 41.

4

Defendant has admitted to using the apartment as a workshop to manufacture his illicit pills, all of which he intended to distribute, while residing elsewhere with his family. ECF at **11-12. In other words, the apartment was used primarily for illegal purposes, at least as of the date of the offense charged.

This evidence alone demonstrates a strong connection between the two loaded pistols and the offense of conviction. It is stronger than the connection that was used to deny safety valve relief in *Bolton*. 858 F.3d at 909, 914 (shotgun and rifle found in same bedroom as 400 grams of marijuana and $912 in cash). Indeed, a defendant's presence in a "hotel room with approximately 140 grams of methamphetamine, a meth pipe, and two Glock G-19 9mm handguns" was enough to establish, beyond a reasonable doubt, that he possessed the guns in furtherance of a drug trafficking crime for purposes of a charge pursuant to 18 U.S.C. § 924(c). *United States v. Gordillo-Escandon*, 832 Fed.Appx. 158, 160, 166 (4th Cir. 2020) (unpublished). Evidence that is strong enough to substantiate a 924(c) conviction is more than enough to defeat a defendant's efforts to show, by a preponderance of the evidence, that his possession of guns was not in connection with drug dealing.

"[C]ourts agree that handguns are more likely to be connected with drug trafficking than long guns." *Bolton*, 858 F.3d at 912.

"Unlike a long gun, a handgun is well-suited to close-quarters self-defense in a drug trafficking operation." *Gordillo-Escandon*, 832 Fed.Appx. at 166. Firearms found in the same bedroom as drugs and cash is sufficient evidence of a connection between the firearms and drug trafficking for purposes of defeating safety valve eligibility. *Bolton*, 858 F.3d at 914. The size of a drug trafficking operation is also a relevant inquiry, as "[l]arger quantities of product equate to more money changing hands, which means a greater profit to be derived from robbing one of the parties." *Gordillo-Escandon*, 832 Fed.Appx. at 166. Defendant's operation was enormous and complex by any measure.

Defendant claims in his motion that he possessed the guns in question for reasons unrelated to any drug activity. ECF 31-1 at **2-3. He claimed in his PSR objections that his possession of the seized firearms was for the purpose of "personal protection and the protection of his family." PSR at *35. However, as discussed earlier, defendant did not live in the Saint Albans apartment. That was the location of his pill workshop. Given that his primary residence, with his family, was elsewhere, it can be presumed that the two loaded pistols served no other purpose than to protect defendant, his drugs, and his money while he was engaged in illegal activities at his apartment. He could have stored them anywhere, yet he chose to store them in close proximity

to drugs, a digital scale, and United States currency, within an apartment that served as an elaborate pill-manufacturing workshop. His choice as to where to store these two pistols, especially when he stored the rest of his guns at his primarily residence, is telling.

Defendant's burden requires him to prove that his possession of these two loaded pistols was more likely for innocent purposes than in connection with the offense of conviction. He has only offered self-serving statements, which is not enough to meet that burden or to counter the evidence already in the record.

Putting the firearms to the side, defendant has also failed to "truthfully provide[] to the Government all information and evidence [he] has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan" as required by 18 U.S.C. § 3553(f)(5). Defendant has provided very little credible information to the United States. His submissions thus far have come in the form of an interview on the date of his arrest on August 29, 2022[2], and communications through

---

[2] Although a recorded portion of this interview was included in the Initial Discovery Response (ECF 15), with the materials relating to that response being sent to the probation office, the details of the interview were not included in the PSR. The United States did not insist upon the inclusion of such details in the form of an objection to the PSR because, at the time, given defendant's apparent acquiescence to the PSR not awarding safety valve relief, the false information shared during that interview

counsel regarding supposed threats made by suspected members of the Mexican Cartel.

During his interview in August 2022, defendant claimed that he did not receive fentanyl in powder form.  Rather, he said that Cartel members would mail pills to him in completed form for him to forward on to customers.  He also claimed that he only received enough pills to fulfill the order at-hand.  When confronted about some of the evidence in the case that he was acquiring equipment used to press powders into pill form, he admitted that he would occasionally "re-press" pills that fell apart in the mail before he received them.  Additionally, he claimed ignorance as to whether the pills contained fentanyl and claimed to have advised Cartel members that he did not want to deal with fentanyl because he was afraid of it.  He expressly denied receiving any powdered fentanyl.

Defendant's story during the interview evolved as he learned more about the evidence possessed by the United States.  Before he knew that investigators were aware about his acquisition of pill-making equipment, he claimed that he did not make pills.  He then molded his story around the facts that investigators shared.  At the time of the interview, however, investigators had not fully

---

did not appear to be particularly relevant.  It was the United States' belief at the time that defendant had, in effect, renounced that interview by agreeing to a substantively different stipulation of facts.

searched defendant's apartment. Knowing that investigators had not found all his pills, defendant did not discuss the fact that he had over 10,000 of them stored in various places throughout the apartment. Such a fact would squarely contradict his statements about the manner in which he received and re-sent the pills. He also denied receiving fentanyl powder and using it to create pills, a fact to which he has now admitted after having received discovery. None of these circumstances are consistent with defendant fully and truthfully complying with his obligations under the safety valve.

Defendant has provided no information that would allow investigators to identify his source, any of his associates, or his customers. Considering the text messages recounted in the PSR, including defendant's discussions about the specifications of the pills and the equipment needed to manufacture the pills (PSR at ¶¶ 28-31), along with the simple fact that the evidence of defendant's involvement in this scheme spans nearly one year, defendant surely has a variety of information related to the offense of conviction and relevant conduct that he could share with investigators.

Defendant's interview, while unbelievable on its face in light of the evidence recovered from defendant's Saint Albans apartment, is also contradicted by defendant's own statements. He

9

has admitted in a signed stipulation of facts to manufacturing the pills that were found in his apartment using fentanyl powder that he had acquired from outside the United States, commercially manufactured binding powder than he had acquired from a U.S.-based company, and "M30" punch and die sets that he had acquired from China. ECF 26 at **11-12. He also admitted to personally manufacturing the pills that were seized from a package that he attempted to distribute by placing it in the mail on August 9, 2022, as well as the pills found in his apartment (which totaled over 10,000). *Id*. at ** 11-12. Beyond that, the PSR recounts several text messages that defendant exchanged with a suspected Chinese source, during which defendant explicitly asks for fentanyl and requests a quote for certain quantities of fentanyl. PSR at ¶¶ 28-29. This is not the behavior of a man who is opposed — for moral reasons or otherwise — to dealing with fentanyl.

The next section will discuss in more detail the alleged threats that defendant claims to have received, and why those claims are inherently incredible. For purposes of the safety valve discussion, however, it is important to note that defense counsel has relayed several screenshots from a cell phone purporting to be missed calls from several phone numbers bearing an area code of "602", which is associated with the Phoenix, Arizona area. These calls apparently were made after defendant was ordered into

custody.  Nevertheless, according to checks performed by the DEA, eight of the nine phone numbers making these calls are registered to "Grand Canyon Education, Inc."  This is an entity formerly associated with Grand Canyon University, an institution of higher learning.  It is now "a shared services partner dedicated to serving colleges and universities."  Grand Canyon Education, Homepage, www.gce.com (last accessed June 3, 2024).  Also, according to open-source checks performed on the internet by DEA personnel, all nine numbers have been reported in the past as being associated with unsolicited, automated marketing (or "spam") calls.  In other words, none of the phone numbers have any known connection to drug trafficking or the Cartel.

Given that defendant's wife did not answer any of the calls to learn the intentions or identities of the caller(s), along with the reality that defendant claims to conduct lawful business in Arizona and the fact that his wife is employed in higher education, there is no reason to jump to the conclusion that these calls were threatening in nature.  As such, the information relating to these missed calls cannot cure the deficiencies in defendant's disclosures to this point.

These deficiencies are fatal, given defendant's affirmative obligation to meet the disclosure requirement.  *Aidoo*, 670 F.3d at 605.  Defendant's motion contains nothing more than a bare

11

assertion that he has been entirely truthful. ECF31-1 at *2. "A defendant's bare assertion that he was truthful, however, is insufficient to satisfy his burden to prove by a preponderance of the evidence that he provided a full and honest disclosure." *Aidoo*, 670 F.3d at 607. Since he was involved in a long-running, complex operation, he is required to share truthful details regarding his involvement in the operation and that of his associates. *Id*. at 610-11. Although defendant must present evidence to prove his compliance, he cannot do so given the paucity, and untrustworthiness, of the information he has provided to this point. This reality has led to the joint motion filed by the parties seeking additional time to allow defendant an opportunity to correct his former statements and satisfy this requirement.

Therefore, defendant cannot presently carry his burden as to two of the five prerequisites for safety valve relief.

### Coercion

Defendant also claims that he should receive a downward departure pursuant to U.S.S.G. §5K2.12 because he "was coerced into committing the offense" by various means including "threats of harm to himself or his family" through "pictures of his home," "videos of executions performed by the cartel," and "multiple phone

12

calls." ECF 31-2 at *2. For the reasons that follow, his request is meritless and should be denied.

The Sentencing Guidelines provide for a downward departure if "the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense." U.S.S.G. §5K2.12. "The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be." *Id*. Defendant is the party advocating for this departure, so he bears the burden of proof by a preponderance of the evidence. *United States v. Sheffer*, 896 F.2d 842, 846 (4th Cir. 1990).

As the Guidelines make clear, the departure is available in circumstances where the facts would not support a complete defense. However, "the same logic that animates the defense also animates § 5K2.12." *Cotto*, 347 F.3d at 446 (*citing United States v. Pinto*, 48 F.3d 384, 389 (9th Cir. 1995) and *United States v. Amparo*, 961 F.2d 288, 292 (1st Cir. 1992)). As such, it is useful to examine the requirements of establishing a coercion or duress defense. Mounting such a defense requires: 1) "that [defendant] acted under an immediate threat of serious bodily injury;" 2) "that he had a

13

wellgrounded [sic] belief that the threat would be carried out;" and 3) "that he had no reasonable opportunity to avoid violating the law and the threatened harm." *United States v. Smith*, 151 F.3d 1031 at *1 (4th Cir. 1998) (unpublished) (*citing United States v. King*, 879 F.2d 137, 139 (4th Cir. 1989). More recently, the elements have been defined as requiring that a defendant prove that he: 1)"was under unlawful and present threat of death or serious bodily injury;" 2)"did not recklessly place [himself] in a situation where [he] would be forced to engage in criminal conduct;" 3)"had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm);" and 4) can show "a direct causal relationship between the criminal action and the avoidance or the threatened harm." *United States v. Gorham Bey*, 373 Fed.Appx. 394, 397 (4th Cir. 2010) (*citing United States v. Ricks*, 573 F.3d 198, 200 (4th Cir. 2009)). At the time of the *Gorham Bey* decision, a defendant had met this standard "only once." 373 Fed.Appx.at 397. The passage of time between the alleged threats and the commission of the offense is a highly relevant factor, as it speaks to a defendant's opportunity to avoid the offense and the supposed danger by notifying the authorities. *Smith*, 151 F.3d at *1. Such opportunity relates directly to the reasonableness of the defendant's actions, a relevant inquiry for purposes of the departure in question.

First, there is no evidence to substantiate defendant's alleged threats aside from his own self-serving statements. A thorough examination of defendant's cell phone, seized from him at the time of arrest, revealed no evidence of videos or messages sent to him from the Mexican Cartel — threatening or otherwise. The missed calls from the Phoenix, Arizona phone numbers, as discussed under the previous heading, are not relevant evidence.

Second, defendant's own statements and actions belie the existence of any such threats. Despite his claim that he was "coerced into participating in the criminal conduct," ECF 31-2 at *1, he communicated openly and cordially with a Chinese source for the purposes of receiving fentanyl powder as well as equipment needed to manufacture illicit pills. PSR at ¶¶ 28-31. These messages demonstrate a high degree of technical knowledge on defendant's part, such as requesting a specific voltage of "110V" and a diameter of "6.5mm" for a particular piece of equipment, asking the maximum dosage for fentanyl, and expressing the desired pressure that he was seeking in the manufactured pills. *Id*.

Despite now claiming that he was operating under threat, he also claimed during his post-arrest interview that he advised Cartel members that he did not want to deal with fentanyl because he was afraid of it. Also, he has claimed in his sentencing memorandum that he "recognized the inherent danger and chose not

15

to sell them [referring to the fentanyl pills], potentially preventing additional harm and overdoses within the community." ECF 31 at *3. Acting upon a moral aversion to fentanyl is not consistent with defendant's claim that he was involved only to avoid harm to himself and his family. If he was seeking to avoid such harm to himself or his family, his fear apparently gave way to his principles. This indicates that he was not in fear at all. Indeed, it is indicative of free will, the antithesis of coercion or duress.

More significantly, defendant's actions were not at all reasonable, as the Guidelines require for this departure. This operation was not built in a single day. Defendant was ordering binding powders commonly used in pill production as early as September 30, 2021, when he ordered two kilograms of such powder. PSR at ¶ 7. The following January, he ordered an additional three kilograms. *Id*. In February 2022, a punch/die set capable of imprinting pills with "M" and "30" and addressed to defendant's primary residence was intercepted from the mail. *Id*. at ¶ 8. The text messages between defendant and the Chinese suppliers of fentanyl powder and equipment began in October 2021. *Id*. at ¶ 28. Therefore, by August 29, 2022, when investigators seized the plethora of evidence from defendant's apartment, defendant had been involved in the enterprise for nearly one year. Not once

16

did he take the reasonable course of action and approach law enforcement officials. While he may claim that he failed to do so due to fear of reprisal, he was quick to speak to authorities about the Mexican Cartel's alleged involvement immediately upon his arrest on August 29, 2022, and he has had no hesitation placing blame upon the Mexican Cartel in public court filings.

There is no objective basis for concluding that defendant's illegal activities were legitimately motivated by threats. Even if they were, the course of action he chose to take — continuing to build his knowledge, equipment, and inventory of pills over an eleven-month period — was entirely unreasonable. He could have approached authorities at any time. Instead, he only did so when he was caught. This proves a lack of aversion or fear when it comes to speaking to the police but is also indicative of a lack of good faith on defendant's part. He spoke to the police only when it became advantageous to him. Defendant does not come close to demonstrating that coercion or duress played any meaningful role in his illegal activities, and he should not be allowed to escape responsibility because of a baseless, *post hoc* rationalization that any defendant in a similar position could make.

Needless to say, defendant's claims of coercion are inherently incredible and lack any basis in objective proof. His

actions were undertaken by his own hand and free will. His hand was in no way forced. Even still, his actions were not objectively reasonable. Either way, he fails to make out a viable cause for a downward departure.

>
> Respectfully submitted,
>
> WILLIAM S. THOMPSON
> United States Attorney

By:

/s/Jeremy B. Wolfe
JEREMY B. WOLFE
Assistant United States Attorney
WV State Bar No. 11952
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
E-mail: jeremy.wolfe@usdoj.gov

**CERTIFICATE OF SERVICE**

    It is hereby certified that the foregoing "UNITED STATES SUPPLEMENTAL SENTENCING MEMORANDUM" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing on this 4th day of June, 2024, to:

```
Rico Moore, Esq.
441 Rockaway Road
Charleston, WV 25302
E-mail: rico@attorneyricomoore.com
```

```
                        /s/Jeremy B. Wolfe
                        JEREMY B. WOLFE
                        Assistant United States Attorney
                        WV State Bar No. 11952
                        300 Virginia Street, East
                        Room 4000
                        Charleston, WV 25301
                        Telephone: 304-345-2200
                        Fax: 304-347-5104
                        E-mail: jeremy.wolfe@usdoj.gov
```