IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                            :
UNITED STATES OF AMERICA,   :   CRIMINAL ACTION
                            :
         Plaintiff,      :   NO. 2:23-cr-00176-01
                            :
           -vs-          :
                            :
TIMOTHY BRIAN JACKSON,     :
                            :
         Defendant.      :
_____x   **REDACTED TRANSCRIPT**

**SENTENCING HEARING**
**BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,**
**SENIOR UNITED STATES DISTRICT JUDGE**
**JUNE 26, 2024**


**APPEARANCES:**

**FOR THE PLAINTIFF:**        **AUSA JEREMY B. WOLFE**
                            Assistant United States Attorney
                            U.S. Attorney's Office
                            P.O. Box 1713
                            Charleston, WV  25326-1713


**FOR THE DEFENDANT:**       **RICO R. MOORE**
                            441 Rockaway Road
                            Charleston, WV 25302


   Proceedings recorded by mechanical stenography, transcript produced by computer.

               _____
           CATHERINE SCHUTTE-STANT, RDR, CRR,
              Federal Official Court Reporter
        300 Virginia Street, East, Room 6009
               Charleston, WV 25301

```
1                          INDEX

2

3    GOVERNMENT'S
     WITNESSES          DIRECT   CROSS   REDIRECT   RECROSS
4

5     (None)

6

7    DEFENDANT'S
     WITNESSES          DIRECT   CROSS   REDIRECT   RECROSS
8

9    CHRISTOPHER JACKSON   23      27

10   KAYSHA JACKSON        29      34

11   WALTER LEE GREENHOWE, 36      39
     JR.
12

13   KAYSHA JACKSON        41      45
     Recalled
14

15

16

17

18

19

20

21

22

23

24

25
```

1          P-R-O-C-E-E-D-I-N-G-S          1:40 p.m.

2          THE CLERK:  All rise.

3          THE COURT:  Good afternoon.  Please be seated.

4          THE CLERK:  The case before the Court is the

5    *United States of America versus Timothy Brian Jackson,*

6    Criminal Action Number 2:23-00176.

7       Would counsel note their appearances for the record,

8    please.

9          MR. WOLFE:  Good afternoon, Your Honor.  Jeremy

10   Wolfe on behalf of the United States.

11         THE COURT:  Thank you.

12         MR. MOORE:  Good afternoon, Your Honor.  Rico

13   Moore on behalf of Mr. Jackson, who is here in person, Your

14   Honor.

15         THE COURT:  Thank you.

16         THE CLERK:  Will the defendant please stand and

17   raise your right hand to be sworn?

18         **TIMOTHY BRIAN JACKSON, DEFENDANT, SWORN**

19         THE CLERK:  Thank you.

20         THE COURT:  Mr. Moore, have you been over the

21   Probation Department's Presentence Report in this case with

22   Mr. Jackson?

23         MR. MOORE:  I have, Your Honor.

24         THE COURT:  Have you gone over it with him

25   thoroughly?

1          MR. MOORE:  Yes.

2          THE COURT:  Can you tell me whether he understands

3     it?

4          MR. MOORE:  I believe he does, Your Honor.

5          THE COURT:  Did he have a number of questions to

6     ask you about the report?

7          MR. MOORE:  He has.

8          THE COURT:  And were you able to answer those to

9     his satisfaction?

10          MR. MOORE:  I believe I have, Your Honor.

11          THE COURT:  Thank you.

12     And, Mr. Jackson, have you read the entirety of the

13     Probation Department's Presentence Report in your case?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Have you gone over it thoroughly with

16     your attorney, Mr. Moore, as well?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Has he explained to you everything you

19     didn't already understand about it after you first read it?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Do you believe you understand

22     everything in that report?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Is there anything about it that you

25     don't understand?

1      THE DEFENDANT:  No, Your Honor.

2      THE COURT:  Thank you.

3   Let me ask, Mr. Moore, whether there are any objections

4   to the report?

5      MR. MOORE:  I believe there is one remaining.

6      THE COURT:  And you may be seated, Mr. Jackson.

7      MR. MOORE:  I believe there is one remaining, Your

8   Honor.  There were actually two.  One involved the two-point

9   enhancement for the firearm.  I'm going to withdraw that

10  objection, Your Honor.  I've actually spoken with the

11  government about it.  I found a case that was directly on

12  point.

13  The reason for the objection, Your Honor, is actually

14  to preserve it due to the situation involving *Bruen* and so

15  on and so forth, just in case something would come about, so

16  we could always go back and appeal, if necessary.

17  However, the case I found, they already litigated that

18  issue, and they found it does apply, and it even applies,

19  despite *Bruen*, because it has to do more with not whether or

20  not he can have the gun but whether or not they can actually

21  tell when and how and so forth, Your Honor.

22      THE COURT:  So do I understand you to say that the

23  objection to the two-level enhancement for the possession of

24  a firearm in connection with the offense is withdrawn?

25      MR. MOORE:  Yes, Your Honor.

1          THE COURT:  And so what objection remains?

2          MR. MOORE:  The four-point enhancement as to

3    marketing and representation of the fentanyl as something

4    other than what it actually is, Your Honor.

5          THE COURT:  You may go ahead with that.

6       But I'm going to ask, can the volume be turned up

7    slightly before Mr. Moore proceeds?

8          MR. MOORE:  You need me to move it closer?

9          THE COURT:  I'm trying to fix it so you can speak

10   straight out, but please go ahead, if would you.

11         MR. MOORE:  Your Honor, our objection is Amendment

12   818 -- I'm sorry -- Section 2D1.1(b)(13), as amended.  That

13   enhancement involves the marketing or representation of

14   fentanyl as something other than it is, Your Honor.

15      My understanding, and my reading of that enhancement

16   involves not just -- well, in this case, not a mens rea, but

17   actually an actus reus situation in which the defendant

18   doesn't have to possess -- simply possess, but he has to

19   market or -- and/or misrepresent.

20      In order to do that, Your Honor, there had to be

21   another individual involved or some -- some type of evidence

22   that would show that he actually did so.  Not that he

23   intended to do so, or he did so with a guilty mind, which

24   would be just a mens rea situation.  This is an actus reus

25   situation.

1       And in that situation, Your Honor, my client simply

2  possessed.  He never communicated to anyone that this was

3  anything other than what it is.

4       And therefore, under the -- under the amendment, it

5  doesn't apply.  This amendment took effect -- came in effect

6  in November of 2023.  But it actually began -- it was

7  actually written in 2018, Your Honor.  And I looked for case

8  law, and I haven't really found any.  I found a couple

9  cases, but they weren't exactly on point.  And one of which

10  is *Marion* -- let's see which district that was -- Northern

11  District of Indiana, Your Honor.

12       It doesn't -- it's not exactly on point, because they

13  decided that case on some other issues, Your Honor, but

14  regardless, I continued to dig.  And as I dug, I found -- I

15  went to the transcripts of the 2023, when they were actually

16  putting the amendment back into place, Your Honor.  And I

17  think I sent it to -- well, I know I sent to it the

18  government, and I sent it to the Probation Officer, as well.

19       And during the hearings, Your Honor -- I have the

20  transcripts here -- in the public hearing on the proposed

21  amendment to the Federal Sentencing Guidelines, Tuesday,

22  March 7, 2023, page 152.  And though it doesn't speak

23  directly to how the amendment is to be interpreted, it gives

24  us an idea where they were going with it, and how it should

25  actually apply, in my opinion, Your Honor.

1       And the person speaking there is a Ms. Freedman.  Ms.

2   Freedman is Carla Freedman.  She's a U.S. Attorney for the

3   Northern District of New York, and she's also the Executive

4   Branch representative during the hearing, Your Honor.

5       May I approach?

6            THE COURT:  I suppose you may do that.

7            MR. MOORE:  Your Honor, the conversation actually

8   begins on page 152, but I believe the pertinent section of

9   the transcript is on page 153.  And it begins with -- at

10  line 8, and it states:  "The difference here is that we are

11  not, and judges are not able to treat the person who

12  knowingly sells a pill that looks like oxycodone that has

13  fentanyl in it any differently than the drug trafficker

14  who's got a little bag of heroin or fentanyl and even

15  indicates that he or she is selling fentanyl to a willing

16  buyer of fentanyl.  That person, where to some degree both

17  the seller and the buyer understand the transaction and the

18  danger that they're engaged in."

19      It continues on -- I'm sorry -- can you see that?

20      "Now, when someone is selling a pill and marketing it

21  or representing it or saying nothing at all, but just from

22  the way that the pill looks, the buyer believes that he or

23  she is" -- I'm sorry -- "that he or she is getting a

24  Percocet, but in fact they're getting fentanyl.  And that is

25  a huge difference that right now there is nothing that a

1    judge can do, unless somehow the government is able to show

2    that the trafficker -- and in this case it would likely have

3    to be the street-level trafficker."

4         Although it may seem convoluted to some, to me, it

5    clearly states that the marketing and representation has to

6    be active, Your Honor.  In other words, they must actually

7    present it to someone as something other than what it is.

8         In other words, the way I understand it is, commit a

9    fraud.  In other words, just -- you just can't have these

10   pills and say, well, this looks like something other than

11   what it is; we can apply this enhancement.

12        There has to be a showing that the person actively

13   engaged in deceiving another individual.

14        And I presented this to the Probation Department.  I

15   also gave it to the U.S. Attorney's Office.  And I believe

16   the U.S. Attorney's Office, their response was simply that

17   she's simply a witness and not a part of the Commission.

18        I believe this lady is beyond a witness.  I believe

19   that she is -- and I know she was the U.S. Attorney for the

20   Northern District.  She's there as a representative of the

21   Executive Branch.  So I think the weight of her statement

22   should be given much more than just being a simple lay

23   witness, an individual from the street, Your Honor.

24        In addition to that, I continued to research, actually

25   late into last night, and I just provided the government

1    with a proffer.  I know you're well-read; you read a lot.

2    And the government often puts out primers to help us as

3    attorneys and lay people understand what they've done and

4    what's out there and how things apply and how they don't

5    apply.

6         And I continued to look, because I felt I was missing

7    something.  And this actual enhancement was created in 2018.

8    So I went back to 2018 and began to read.  And I came

9    forward, and as I got to 2020, I came upon a primer.  And

10   that primer is actually written by the Sentencing

11   Commission.  And on page 32 of that primer, they address

12   misrepresentation.  And the last paragraph, bottom

13   right-hand side -- which may I retrieve that, Your Honor?

14   I'll present that, as well.

15        And, Your Honor, this is the primer from January 2021

16   from the United States Sentencing Commission, and it's page

17   32.  And this primer concerns fentanyl and fentanyl

18   analogues.  And if we look at the bottom of the page,

19   intentional misrepresentation.

20        And if I may be allowed, Your Honor, it says, some

21   offenders who misrepresented fentanyl and its analogues

22   engaged in particularly aggravating conduct by intentionally

23   misrepresenting these substances to consumers during a drug

24   transaction.  The Commission determined that an offender

25   knowingly misrepresented fentanyl or a fentanyl analogue

1    when the offender specifically sold, advertised, or

2    misrepresented one of these drugs as something other than

3    fentanyl or one of its analogues during a drug transaction

4    with a user, buyer, or coparticipant and knew fentanyl or

5    its analogue was present by admission.

6        Your Honor, that -- Your Honor, that is from the

7    Sentencing Commission.

8        And that speaks to an actual sale or misrepresentation

9    by an individual who actually possesses such; not simply

10    possessing or even manufacturing.  It speaks to a person who

11    intentionally deceives a person into believing that what

12    they are receiving, it is something other than what they

13    believe it to be.

14        And in this case, Your Honor, Mr. Jackson didn't do so.

15    Therefore, I don't believe that the four-point enhancement

16    should apply.

17            THE COURT:  Thank you.  Anything further, Mr.

18    Moore?

19            MR. MOORE:  Nothing further, Your Honor.

20            THE COURT:  Are there any other objections?

21            MR. MOORE:  None, Your Honor.

22            THE COURT:  Before I turn to the United States to

23    respond, I would ask you, insofar as you are aware, is this

24    report in all respects, Mr. Moore, factually correct?

25            MR. MOORE:  I do believe so, Your Honor.

1           THE COURT:  All right.  And, Mr. Jackson, is this

2    report, that is, the Presentence Report, in all respects

3    factually correct?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  Thank you.  And you may be seated.

6       Mr. Wolfe.

7           MR. WOLFE:  Thank you, Your Honor.  Your Honor,

8    it's the United States' position that the four-point

9    enhancement included in the PSR by the Probation Office for

10   knowingly misrepresenting fentanyl as another substance is

11   properly applied in this case.

12       I've received and reviewed the materials that Mr. Moore

13   just discussed.  The Sentencing Commission primer I was

14   given as I sat here in the courtroom just prior to the

15   hearing beginning.

16       The transcript I received yesterday.

17       To sum up both of those documents, I would simply say

18   the transcript involves comments by a witness to a

19   Sentencing Commission hearing.  Her comments are in no way

20   binding on the Commission, and in no way alter the plain

21   language of the guideline provision that we're talking

22   about.

23       She was simply making policy arguments about why the

24   mens rea requirement of the enhancement that existed at that

25   time was too strict; and therefore, the enhancement was not

1    applied often enough.

2         This primer that Mr. Moore just discussed, again, is a

3    policy discussion.  It does nothing to modify the plain

4    language of the guideline provision that we're talking

5    about, which, again, is properly applied.  It requires a

6    knowing misrepresentation or that the defendant knowingly

7    market as another substance a mixture or substance

8    containing fentanyl or an analogue.

9         This was not a simple possession case.  The offense of

10   conviction is possession with the intent to distribute.

11        The defendant necessarily admitted by entering a guilty

12   plea that he had the intent to distribute this fentanyl,

13   and, in fact, in the facts stipulation attached to the plea

14   agreement, admitted that he intended to distribute the pills

15   that were found in his apartment.

16        The defendant also imported from China several punch

17   and die kits capable of imprinting pills with "M30"

18   markings.  Those M30 markings are well-recognized throughout

19   the law enforcement community and the judicial system as

20   being, essentially, trademarks or the brand markings

21   associated with 30-milligram oxycodone pills.

22        The defendant admitted to acquiring fentanyl powder

23   from outside the United States.  And we know from his text

24   messages that he was actually actively seeking out fentanyl.

25   He knew the pills contained fentanyl.

1      It's actually illegal under federal law to even possess

2    the punch and die kits capable of putting "M30" on pills,

3    but yet, he had 23 of them in his apartment turned workshop

4    that was raided by the police on August 29, 2022.

5      He's admitted that he acquired those punch and die kits

6    for the express purpose of making his pills look like

7    legitimately-manufactured 30-milligram oxycodone pills.

8      It's true that the case law regarding this enhancement

9    is not well developed.  There is very little case law out

10   there.  But Mr. Moore referred to the *Marion* decision from

11   the Northern District of Indiana.  And I actually cited that

12   case in the United States' initial Sentencing Memorandum, as

13   well.  That case discusses this enhancement.  And there is

14   language in that opinion reflecting that the Court felt the

15   very act of placing those "M30" markings on the counterfeit

16   pills qualifies as a knowing misrepresentation.  Those "M30"

17   markings are meant to convey to the consumer that they are

18   getting a 30-milligram oxycodone pill; when, in fact, the

19   pills that the defendant was creating and had the intent to

20   distribute to others contained fentanyl or a related

21   substance, Protonitazene, which has a chemical makeup

22   similar to fentanyl and actually is more -- is stronger than

23   fentanyl.

24     The knowledge the defendant possessed thousands of

25   pills containing fentanyl with his "M30" markings; he also

1    placed a box of pills containing the related analogue

2    substance Protonitazene in the mail, intended for the

3    recipient.  Thankfully, those pills were intercepted by law

4    enforcement.

5        So based upon all that, it's the United States'

6    position that the defendant, by acquiring illegal punch and

7    die kits for the express purpose of putting "M30" markings

8    on fentanyl pills, knowingly misrepresented those pills as

9    containing something other than fentanyl, and the

10   enhancement is properly applied.

11           THE COURT:  What was the contents of the parcel to

12   Connecticut?

13           MR. WOLFE:  Your Honor, that parcel contained 399

14   pills that contained Protonitazene, not fentanyl.

15           THE COURT:  And the substance, again, was what,

16   did you say?

17           MR. WOLFE:  Protonitazene, Your Honor.

18           THE COURT:  In its entirety?

19           MR. WOLFE:  I believe that's how it's described in

20   the Presentence Report, Your Honor.

21           Your Honor, the laboratory referred to it as

22   Protonitazene.

23           THE COURT:  Let me ask you about paragraph 24 of

24   the Presentence Report.

25           MR. WOLFE:  Yes, Your Honor.

1          THE COURT:  It refers to that parcel and says the

2     following items were recovered.

3          This is recovered on August 12, 2022:  A clear

4     heat-sealed wrapper that contained two heat-sealed Ziploc

5     baggies that contained blue tablets marked with a, quote,

6     "M," unquote, and quote, "30," end quote, (Exhibit 6).

7          This item was field tested and yielded a positive

8     result for fentanyl.

9          MR. WOLFE:  Yes, Your Honor.

10          THE COURT:  That does not seem to be in keeping

11     with what you've just stated that the substance was, I

12     believe you said -- you called it Protonitazene.

13          MR. WOLFE:  Your Honor, paragraph 25 of the

14     Presentence Report, the very next paragraph, discusses the

15     lab analysis of the pills from that package.  And those

16     pills came back as 399 pills containing Protonitazene -- and

17     perhaps I'm not pronouncing that appropriately.

18          THE COURT:  How does that qualify then?  Is it the

19     case that those pills stamped with an "M" and a "30,"

20     appeared to be oxycodone, but instead, were something else

21     in this case, Protonitazene?  Is that correct?

22          MR. WOLFE:  Yes, Your Honor.

23          THE COURT:  And characterize Protonitazene

24     further, if you would, please.

25          MR. WOLFE:  Your Honor, the Probation Officer in

1   preparing this report spoke to a DEA chemist on April 12th

2   of this year.  And the DEA chemist stated -- and this is

3   contained in Footnote 4 on page 22 of the PSR -- he DEA

4   chemist stated that Butonitazene and Protonitazene both have

5   the chemical makeup of fentanyl, and are much stronger than

6   fentanyl.

7        And based upon all that, and the definition of fentanyl

8   analogue set forth in the guidelines, that being that a

9   substance qualifies as a fentanyl analogue if it has a

10  chemical structure substantially similar to fentanyl, it

11  would be the United States' argument that Protonitazene is,

12  in fact, for this purpose, a fentanyl analogue.

13            THE COURT:  Thank you.  Anything further, Mr.

14  Wolfe?

15            MR. WOLFE:  No, Your Honor.

16            THE COURT:  Mr. Moore.

17            MR. MOORE:  Your Honor, I believe the government's

18  missing the point here.  It's not whether or not he

19  possessed.  This has to do with whether or not he actually

20  misrepresented or marketed.

21            THE COURT:  Well, what he was sending -- the

22  parcel off to Connecticut, what does that amount to?

23            MR. MOORE:  It amounts to a possible distribution,

24  but in order to prove a misrepresentation or marketing, you

25  have to, basically, interview the person on the other end

1    and their expectation has to be that what they were

2    receiving is other than what it is.

3            THE COURT:  Where does that requirement appear in

4    the guidelines?

5            MR. MOORE:  It's not in the guideline, Your Honor.

6    And it's not -- it's not well-represented in any case law,

7    Your Honor.  However, in reading and keeping with, I

8    believe, the spirit of the hearings that were held, and with

9    the primer, it's very clear that the requirement is -- and

10   that is what the argument was about at the hearing -- was

11   the fact that it's necessary, and it's not often applied,

12   simply because, one, they have to prove knowledge; two, they

13   also have to show that the individuals were not in agreement

14   as to what they were buying.

15        So, in other words, to make it, you know, quite simple,

16   if a person were to, I guess, have a counterfeit handbag and

17   you understood or a young lady understood she was buying a

18   counterfeit handbag therein, there is no problem.

19        However, if I misrepresent and tell this lady that,

20   yes, this is an original, it is what it looks like, and she

21   buys it as such, and I deceive her, therein lies the

22   problem.

23        And that's the issue that they were trying to address.

24   Not the simple possession of or with the intent to, but the

25   actual --

1          THE COURT:  It's not possession -- the defendant

2     would already have surrendered possession of those items

3     when they were sent off in a parcel to Connecticut.

4          MR. MOORE:  Right, but the government also has not

5     presented any evidence to show that the individual on the

6     other end, whoever that may have been, that was to receive

7     those items, had been deceived.  It's a deception issue,

8     Your Honor.

9          Not whether or not -- so if the person on the other end

10    knew what they were receiving were pills marked with the 30,

11    "M30," and they knew that they were fentanyl or Proto --

12    however you say that word -- and they knew they weren't

13    actually Percocet or otherwise, which was what they were

14    arguing about in the actual hearing, Your Honor, then it

15    applies.

16         It's the deception aspect of it that is the actual

17    danger they were trying to mitigate.  And it has to be an

18    active deception, Your Honor; not a perceived or, you know,

19    presumed, Your Honor.

20         THE COURT:  Thank you.

21         And, Mr. Wolfe, I'm going to ask you to address that

22    point specifically having to do with the contention of Mr.

23    Moore that someone has to be deceived.

24         MR. WOLFE:  Your Honor, these pills -- first of

25    all, whether we're talking about the pills the defendant put

1  into the mail or the pills that the defendant possessed at

2  his apartment, he intended to distribute all of those pills.

3      Those pills were manufactured for the purpose of

4  somebody consuming them at some point.  The defendant,

5  himself, according to the PSR, is not a fentanyl user.  So

6  somebody else would have been consuming them.  And it may

7  not have been the person in Connecticut who was getting the

8  pills.  The person in Connecticut who was getting the pills,

9  getting 400 of them, was likely a distributor his or

10  herself.

11      And so the defendant has placed these pills -- or

12  intended to place even more of these pills into the stream

13  of commerce with, essentially, false markings on them, that

14  would give rise to an expectation on the part of the

15  end-user that these are oxycodone.  And that's the danger

16  that the Sentencing Commission was really trying to address

17  with this.

18      Possession with the intent to distribute fentanyl can

19  encompass a fairly broad range of actions.  It could be

20  powder fentanyl.  But, in this case, they were pills

21  specifically stamped for the purpose of making them look

22  like oxycodone.

23      Whether that's the person the defendant's dealing

24  directly with, or somebody further downstream, the fact that

25  those pills are put out there or the defendant intends to

1    put those pills out there, he has already stamped them with

2    "M30"; he's already committed a deceptive act with the

3    intent of deceiving somebody else.  And the enhancement

4    should apply to that conduct, Your Honor.

5            THE COURT:  Thank you.

6        Mr. Moore, anything further?

7            MR. MOORE:

8        (An off-the-record discussion was held between defense

9    attorney Moore and the defendant.)

10            MR. MOORE:  Just briefly.  If the Commission

11    wanted this to apply to those who intended to do so, not

12    who -- somebody who actually did so, they would have put it

13    in the enhancement.  It would have been written.

14        The plain language of marketing has to do with the

15    presentation to individuals to induce them to act.  The

16    plain language of presentation has to do with showing or

17    displaying something or an individual, some thing, Your

18    Honor.  And if we used the plain language, given that we

19    don't have very much case law, then this act should be

20    included.  And the interpretation should be done so, you

21    know, with limiting.

22        And in that case, Your Honor, then it should be decided

23    on the side of the defendant, Your Honor.  That's it.

24            THE COURT:  Thank you.

25        And let me ask, as well, at some point here, after the

1   Presentence Report was prepared, you raised the issue of

2   safety valve.

3              MR. MOORE:  Yes, Your Honor.

4              THE COURT:  And I would simply ask whether or not

5   you have withdrawn that?

6              MR. MOORE:  No.

7              THE COURT:  And so you may proceed with it at this

8   point.

9              MR. MOORE:  Your Honor, I'd like to call a witness

10  at this time, Your Honor.

11             THE COURT:  You may.

12             MR. MOORE:  I'd like to call Chris Jackson.

13             THE CLERK:  Please come to the lectern right here

14  and raise your right hand to be sworn.

15      **CHRISTOPHER JACKSON, DEFENDANT'S WITNESS, SWORN**

16             THE CLERK:  Would you please state your full name,

17  and spell your last name for the record.

18             THE WITNESS:  Christopher Dewayne Jackson,

19  J-A-C-K-S-O-N.

20             THE CLERK:  Thank you.  Have a seat over here at

21  the witness stand.

22             MR. MOORE:  Your Honor, would you prefer me to ask

23  questions from here or the podium?

24             THE COURT:  As you wish.

25             MR. MOORE:  I'll use the podium.

1                      **DIRECT EXAMINATION**

2     **BY MR. MOORE:**

3     **Q.**   Hello.

4     **A.**   How you doing?

5     **Q.**   Please state your full name for the record, please.

6     **A.**   Christopher Dewayne Jackson.

7     **Q.**   And, Mr. Jackson, what is your employment?

8     **A.**   I am the assistant vice president of --

9               THE COURT:  Turn that volume up.

10          (Pause.)

11               THE COURT:  Please go ahead.

12               THE WITNESS:  I'm the Assistant Vice President for

13     Enrollment Management and Student Affairs, and Dean of

14     Students at West Virginia State University.

15     BY MR. MOORE:

16     **Q.**   And what is your relation to Timothy Brian Jackson?

17     **A.**   I'm his oldest brother.

18     **Q.**   So fair to say you've known him your whole life?

19     **A.**   All his life.

20     **Q.**   All his life.  And so you grew up in the same house?

21     **A.**   Yes.

22     **Q.**   During your upbringing, did you, or Mr. Jackson, your

23     brother, did you ever engage in any sporting activities?

24     **A.**   Yeah, we played -- I played basketball up until high

25     school.  He played football in the midget league, and I

 1    think he stopped in junior high.  He attempted to play

 2    football again in college, but it didn't work out for him

 3    too well.

 4    **Q.**   Okay.  During your upbringing, what type of person was

 5    Timmy?

 6              THE COURT:  I don't think we're getting into that

 7    at this point.  The question here is the one on safety

 8    valve.

 9              MR. MOORE:  Yes, Your Honor.

10              THE COURT:  And that's what you need to address.

11              MR. MOORE:  I will limit my questions to that,

12    Your Honor.

13    BY MR. MOORE:

14    **Q.**   Have you known Timmy to be honest?

15    **A.**   Yes.

16    **Q.**   Guns -- have you ever known Timmy to have guns?

17    **A.**   Yes.

18    **Q.**   Have you ever seen him with guns?

19    **A.**   Yes.  We've gone shooting before at the Kanawha State

20    Forest.

21    **Q.**   Did you know him -- what year was that?

22    **A.**   I don't know.  It's been years.  I'm talking about back

23    in college.  So I've known Tim to own guns for the better

24    part of 15, 20 years.

25    **Q.**   And did you guys ever discuss having firearms?

1    **A.**   Yes.

2    **Q.**   And what did that discussion entail?

3    **A.**   I mean, just to have, I mean, to protect the family, to

4    just be safe.

5    **Q.**   Did you ever visit his home?

6    **A.**   In --

7    **Q.**   South Charleston?

8    **A.**   Yes.

9    **Q.**   Did you ever see any guns there?

10   **A.**   Did I see them there?

11   **Q.**   Yes.

12   **A.**   No.

13   **Q.**   Well, what about the apartment in St. Albans?

14   **A.**   Did I see them there?  I mean, yes, I've seen them

15   before.

16            THE COURT:  Just one moment.

17   BY MR. MOORE:

18   **Q.**   Your brother, Timmy, his apartment in St. Albans, did

19   you ever visit?

20   **A.**   Yes.

21   **Q.**   And what year was this?

22   **A.**   He and I were neighbors when I used to visit more

23   frequently.  I think he stayed in Apartment 5 or 6, and I

24   was in Apartment 2.  So his front door was literally 15

25   yards from mine.  So when we lived in that same complex, I

1    used to visit quite frequently.

2    **Q.**   Was this in 2023?

3    **A.**   This was about 11 years ago now.

4    **Q.**   11 years ago?

5    **A.**   I would go over there.

6    **Q.**   And 11 years ago, did you know Timmy to have any guns?

7    **A.**   Yes.

8    **Q.**   And how often did you visit that apartment then?

9    **A.**   When I lived over there?

10   **Q.**   Yes.

11   **A.**   Daily.

12   **Q.**   While you were at the apartment daily, did you observe

13   any drug activity?

14   **A.**   No.

15   **Q.**   So as far as you know -- or do you know what Mr.

16   Jackson, or Timmy's reasons were for owning firearms?

17   **A.**   Protection, family protection.

18   **Q.**   Family protection.  What type of firearms did he own?

19   **A.**   I know handguns; maybe a rifle at the time.  Again,

20   this was so many years ago.

21   **Q.**   Various weapons?

22   **A.**   Sure, yes.

23   **Q.**   Did you guys actually use those guns?

24   **A.**   We would go shoot at Kanawha State Forest, from time to

25   time.

1   **Q.**   So nothing illegal?

2   **A.**   No.

3   **Q.**   Sorry, Your Honor.  When you guys went to Kanawha State

4   Forest, was anybody else ever present?

5   **A.**   Yes.  General public, people.  We've gone with my

6   younger brother before.  I mean, yes.

7   **Q.**   So it was a family activity?

8   **A.**   Sure.

9   **Q.**   So the purpose of the firearms, as far as you know,

10  were to protect the home?

11  **A.**   Yes.

12  **Q.**   And general shooting, family activities?

13  **A.**   Yes.

14         MR. MOORE:  I don't have any more questions, Your

15  Honor.  No more questions.

16         THE COURT:  Thank you.

17         MR. WOLFE:  If I may, Your Honor?

18                    **CROSS-EXAMINATION**

19  **BY MR. WOLFE:**

20  **Q.**   Mr. Jackson, when was the last time that you went over

21  to your brother's apartment on ▮▮▮▮▮ Street in St. Albans,

22  Apartment 5?

23  **A.**   It's been a few -- it's been a while.  Actually, I

24  think the last time I went is when I went to shower when we

25  had that chemical spill in the city.  So that was some years

1    ago.  I think that was the last time I was over there.

2    **Q.**   Would that have been around 2013, 2012?

3    **A.**   Whenever, yes.  Whenever it was.

4    **Q.**   Approximately 10 years ago?

5    **A.**   Sure.

6    **Q.**   And when you were over at the apartment, you said you

7    saw guns when you were there?

8    **A.**   No.  I knew -- I knew they were there.  I mean, it's

9    not like they were just laying on the couch.

10   **Q.**   Understood.  You knew they were there, but you didn't

11   see them sitting out?

12   **A.**   Correct.

13   **Q.**   And did you have any knowledge of, prior to your

14   brother's arrest, his drug activity?

15   **A.**   No, sir.

16          MR. WOLFE:  No further questions, Your Honor.

17          MR. MOORE:  No questions, Your Honor.

18          THE COURT:  May Mr. Jackson be excused?

19          MR. MOORE:  Yes, Your Honor.

20          THE COURT:  Thank you, sir.

21          MR. MOORE:  Your Honor, I'd like to call my next

22   witness, Your Honor.

23          THE COURT:  Go ahead.

24          MR. MOORE:  I'd like to call Kaysha Jackson, Your

25   Honor.

1      THE CLERK:  Please raise your right hand to be

2  sworn.

3           **KAYSHA JACKSON, DEFENDANT'S WITNESS, SWORN**

4      THE CLERK:  State your full name, and spell it for

5  the record.

6      THE WITNESS:  Kaysha Jackson, J-A-C-K-S-O-N.

7      THE CLERK:  Could you please say that a little

8  louder?

9      THE WITNESS:  K-A-Y-S-H-A Jackson.

10      THE CLERK:  Thank you.  You can have a seat at the

11  witness stand.

12                    **DIRECT EXAMINATION**

13  **BY MR. MOORE:**

14  **Q.**  Hello.  Could you please state your full name for the

15  record?

16  **A.**  Kaysha Jackson.

17  **Q.**  And how old are you, Ms. Jackson?

18  **A.**  40.

19  **Q.**  Where are you employed?

20  **A.**  West Virginia State University.

21  **Q.**  And what is your relationship to the defendant?

22  **A.**  He is my husband.

23  **Q.**  And how long have you guys been married?

24  **A.**  Seven years on the 24th.

25  **Q.**  And how long were you guys in a relationship?

1    **A.**   Since 2004.

2    **Q.**   So during this relationship, say, beginning in 2004,

3    did you visit Mr. Jackson's home?

4    **A.**   Yes.

5    **Q.**   And where was that at the time?

6    **A.**   Initially, it was his grandmother's home in Dunbar,

7    West Virginia.

8    **Q.**   There ever come a time in which Mr. Jackson moved to

9    St. Albans?

10   **A.**   Yes.

11   **Q.**   And do you know around about the year?

12   **A.**   I can't recall.  I can't recall.

13   **Q.**   But you were aware he moved to St. Albans?

14   **A.**   Yes.

15   **Q.**   And did you visit that apartment?

16   **A.**   Yes.

17   **Q.**   How frequently?

18   **A.**   Almost daily, as a new girlfriend.

19   **Q.**   Almost daily.  While you were there, did you happen to

20   see Mr. Jackson with any firearms?

21   **A.**   Yes.

22   **Q.**   How often?

23   **A.**   I knew that he would usually go shooting with his

24   brothers and stuff like that, or his best friend, so it was

25   during those times whenever they were getting ready to go to

1    the park.

2    **Q.**   And while you were at his apartment, did you see any

3    illegal activity?

4    **A.**   No.

5    **Q.**   Okay.  Obviously, as his wife, you are aware of his

6    arrest, correct?

7    **A.**   Correct.

8    **Q.**   And you know that took place at that same apartment,

9    correct?

10   **A.**   Correct.

11   **Q.**   Had you been to that apartment in -- when was the last

12   time you had actually been to that apartment?

13   **A.**   Prior to the arrest?

14   **Q.**   Prior to the arrest?

15   **A.**   Probably a year before.

16   **Q.**   All right.  And you guys are married, correct?

17   **A.**   Correct.

18   **Q.**   And you live together?

19   **A.**   Yes.

20   **Q.**   And where did you live?

21   **A.**   In South Charleston.

22   **Q.**   And in your home, did you have firearms?

23   **A.**   Yes.

24   **Q.**   How many?

25   **A.**   Two or three, I believe.

1    **Q.**   Are you aware of where these firearms came from?

2    **A.**   Yeah.

3    **Q.**   And where was that?

4    **A.**   Some of them were purchased, like, at the gun show that

5    they have, like, in St. Albans.  I forget the name of the

6    store.  Some of them were gun show, and others were

7    purchased from someone else.

8    **Q.**   Were you ever present during these purchases?

9    **A.**   Yes.

10   **Q.**   Did you guys ever discuss having firearms in your

11   house -- in your home or at the apartment?

12   **A.**   The apartment, yes.  The firearms for the apartment

13   came after there was a break-in that -- there was several

14   break-ins in that complex.  And then we discussed getting a

15   firearm, basically, to protect the house.

16   **Q.**   Okay.  And what about the firearms in your home?

17   **A.**   It was the same thing.  Although, my home, we didn't

18   have any break-ins, but it was kind of the same thing.

19   **Q.**   Did you ever participate in shooting activities?

20   **A.**   No.  But he did show me how to load, unload, basically,

21   safety if I was at home by myself.

22   **Q.**   Were you ever aware of Mr. Jackson obtaining his

23   license to carry a firearm?

24   **A.**   Yes.  Actually, I think we all kind of went and did it

25   at the same time.

1    **Q.**   So you have your license to conceal?

2    **A.**   It's no longer valid, but, yes, I had it at one point.

3    **Q.**   So you went with your husband and others to obtain that

4    license?

5    **A.**   Correct.

6    **Q.**   At any time, did he ever discuss any illegal activities

7    with you?

8    **A.**   No.

9    **Q.**   Okay.  So, prior to his arrest, you said you had not

10   been at the apartment for at least a year?

11   **A.**   It may be less than that, but, yeah.

12   **Q.**   So you weren't aware -- you can't specifically state

13   that you saw any firearms prior to his arrest for at least

14   six months to a year?

15   **A.**   Correct.

16   **Q.**   So would it be fair to say that your husband possessed

17   these firearms in order to protect his family and home?

18   **A.**   Yes.

19   **Q.**   You guys have kids?

20   **A.**   Yes, we have two.

21   **Q.**   Two.  Has he ever shared his knowledge about firearms

22   with your kids that you are aware of?

23   **A.**   Absolutely.

24   **Q.**   Which one?

25   **A.**   Both of them, actually.  The youngest one doesn't quite

1    understand, but we always talk about gun safety; basically,

2    what numbers to call when things happen.  But the oldest

3    one, he did the same thing that he did with me, showing him,

4    basically, this is a gun, you know, this is what it looks

5    like, this is what you use it for, that type of thing, yeah.

6    **Q.**    Did he store these guns in a specific place?

7    **A.**    Away from the kids.  They weren't in the open.  In the

8    bedroom, yeah.

9           MR. MOORE:  Thank you, Your Honor.

10                    **CROSS-EXAMINATION**

11   **BY MR. WOLFE:**

12   **Q.**    Ms. Jackson, you just testified that your husband would

13   often keep firearms in the bedroom.  Are you referring to

14   ████████ Way or your family residence?

15   **A.**    Both, and St. Albans.

16   **Q.**    When was the -- you said it had been a year -- prior to

17   your husband's arrest, you said it had been about a year

18   since you had been at the apartment?

19   **A.**    I can't say that it's -- we started having issues.  So

20   saying a year might be a bit much.  But I know we started

21   having issues, and then we separated.

22   **Q.**    And when you were over there, approximately, a year

23   prior to his arrest, do you recall seeing any guns there at

24   that time?

25   **A.**    Not in the open, but I know they were there.

1          MR. WOLFE:  No further questions, Your Honor.

2          MR. MOORE:  I have no more questions for Ms.

3    Jackson.

4          THE COURT:  Any further questions, Mr. Moore?

5          MR. MOORE:  No, Your Honor.

6          THE COURT:  And may Ms. Jackson be excused?

7          MR. MOORE:  Yes, Your Honor.

8          THE COURT:  Thank you, ma'am.

9          THE WITNESS:  Thank you.

10          MR. MOORE:  One second, Your Honor.

11      (Defense attorney Moore conferring off the record.)

12          MR. MOORE:  Your Honor, I have one last witness,

13    Lee Greenhowe, Your Honor.

14          THE COURT:  Again, please.

15          MR. MOORE:  Lee Greenhowe.

16          THE CLERK:  Please come to the lectern and raise

17    your right hand to be sworn.

18    **WALTER LEE GREENHOWE, JR., DEFENDANT'S WITNESS, SWORN**

19          THE CLERK:  State your full name, and spell your

20    last name for the record.

21          THE WITNESS:  Walter Lee Greenhowe, Jr.,

22    G-R-E-E-N-H-O-W-E.

23          THE CLERK:  Thank you.  You can have a seat at the

24    witness stand.

25          THE WITNESS:  Thank you.

1  **DIRECT EXAMINATION**

2  **BY MR. MOORE:**

3  **Q.**  Mr. Greenhowe, would you please state your full name

4  for the record?

5  **A.**  Walter Lee Greenhowe, Jr.

6  **Q.**  And where are you employed?

7  **A.**  I work for State Farm Insurance.

8  **Q.**  And where do you reside?

9  **A.**  Baltimore, Maryland.

10  **Q.**  And are you familiar with the defendant, Timothy Brian

11  Jackson?

12  **A.**  Yes.  Timmy has been my best friend probably since we

13  were third grade.

14  **Q.**  Okay.  Are you familiar with Mr. Jackson owning

15  firearms?

16  **A.**  Yes.  I don't exactly recall.  I'm pretty sure that we

17  went to the class together to obtain our concealed permit,

18  or, if not, I gave him the information for the class so he

19  could go slightly afterwards, because somehow worked with --

20  State Farm at the time had the class; they were putting on

21  the class.

22  **Q.**  Do you recall the year?

23  **A.**  It would have to be 2005 or '6.  It was when I was

24  still living in West Virginia.  And I've been gone from West

25  Virginia for probably 15 years.

1   **Q.**  Did you ever have occasion to visit Mr. Jackson in his

2   home?

3   **A.**  Yes.  I've visited him in every home he's ever lived

4   in, as far as the apartment, the home they lived in

5   together, his grandmother's house.

6   **Q.**  The apartment, would that be the one in St. Albans?

7   **A.**  Yes, sir.

8   **Q.**  And since 2005, how many times would you say you

9   visited him in that home?

10  **A.**  A lot.  I mean, I don't know the exact amount.  When I

11  would come home, I would go -- always visit him, whether he

12  was there or at the other house.  So, numerous times.  I

13  mean, it's -- probably five or six times a year.

14  **Q.**  Okay.  So is it fair to say you guys would hang out at

15  that apartment?

16  **A.**  We would hang out there and everywhere else, yeah.

17  **Q.**  Would other people hang out at the apartment, as well?

18  **A.**  Yes.  I -- fraternity brothers, other friends, yeah.

19  **Q.**  While you were at the apartment, did you have the

20  occasion to see any firearms?

21  **A.**  From my recollection, I don't remember seeing any

22  firearms.  I knew they were there.  I've seen them when we

23  -- I think his brother mentioned, when we go to Kanawha

24  State Forest, I've been up there several times with him to

25  target practice.  But I don't -- I knew they were there.  I

1     knew he possessed them.  When we were in college, he

2     possessed them, I think.  But, no, it was -- I never

3     actually laid eyes on them.  They were never out in the open

4     or never on the couch or they were never anywhere like that.

5     **Q.**   But you have seen Mr. Jackson with firearms?

6     **A.**   Yes.

7     **Q.**   Do you know what type of firearms?

8     **A.**   If I recall, he had a AK-47.  Mr. Jackson also had a

9     Glock .40.  I think we have one similar to each other.  I

10    want to say a Smith & Wesson -- I don't know exactly what

11    they were, but we had several.  And I still possess some.

12    And I still have my concealed permit for Maryland.

13    **Q.**   His home in South Charleston, were you aware of

14    firearms being there?

15    **A.**   Yes.

16    **Q.**   Did you guys ever discuss any reasoning behind owning

17    firearms?

18    **A.**   A lot of it was for protection, but, also, just for

19    recreation, you know, just to go shoot, have fun, go target

20    practice.

21    **Q.**   At any time, did Mr. Jackson ever mention owning

22    firearms to protect the drug trade?

23    **A.**   No.  I never even seen Mr. Jackson have a firearm

24    outside of his house, besides when we were transporting --

25    you know, going to the range.  Never seen him flash it, pull

1    it out, anything of that.

2    **Q.**   Okay.  So he never mentioned having to protect his

3    apartment or his home due to illegal activities?

4    **A.**   No.  Never.

5    **Q.**   Okay.

6             MR. MOORE:  No more questions, Your Honor.

7             THE COURT:  Cross-Examination.

8             MR. WOLFE:  Just briefly, Your Honor.

9                        **CROSS-EXAMINATION**

10   **BY MR. WOLFE:**

11   **Q.**   Sir, did Mr. Jackson ever discuss drug dealing or

12   fentanyl with you?

13   **A.**   No, sir.

14            MR. WOLFE:  No further questions, Your Honor.

15            MR. MOORE:  No further questions, Your Honor.

16            THE COURT:  And may he be excused?

17            MR. MOORE:  Yes, he may, Your Honor.

18            THE COURT:  Thank you, sir.

19            THE WITNESS:  Thank you.

20            THE COURT:  Any further evidence on safety valve?

21            MR. MOORE:  One second, Your Honor.

22        (An off-the-record discussion was held between defense

23   attorney Moore and the defendant.)

24            MR. MOORE:  I don't think we are going to call any

25   more witnesses, Your Honor.

1          THE COURT:  Thank you.

2       Does the government have any witnesses on the point?

3          MR. WOLFE:  No, Your Honor.

4          THE COURT:  Mr. Moore, you raised one other issue

5     that I think you wish considered for either a departure or

6     variance, and it has to do with coercion.

7          MR. MOORE:  Yes, Your Honor.

8          THE COURT:  Do you have any evidence that you wish

9     to submit?

10          MR. MOORE:  Besides the calling of Mr. Jackson's

11     wife as a witness to testify, Your Honor, that would be the

12     only evidence I could submit at this time.

13          THE COURT:  And so do you wish to recall her for

14     that purpose?

15          MR. MOORE:  Yes, Your Honor.

16          THE COURT:  You may do so.

17          THE CLERK:  Please come to the lectern.

18       **KAYSHA JACKSON, DEFENDANT'S WITNESS RECALLED, SWORN**

19        **PREVIOUSLY**

20          THE COURT:  Ms. Jackson, you've already been

21     sworn.  You remain under the same oath.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Thank you.

24          THE WITNESS:  Thank you.

25

1    **DIRECT EXAMINATION**

2    **BY MR. MOORE:**

3    **Q.**   Ms. Jackson, you've already stated your full name and

4    the particulars for the record.

5        What I want to ask you about now has to do with

6    coercion.  And with that, I'll be -- do you understand what

7    coercion means?

8    **A.**   Yes.

9    **Q.**   Okay.  Did there ever come a time in which Mr. Jackson

10   made you aware that he was in fear?

11   **A.**   This was immediately after the arrest.

12   **Q.**   How did he make you aware?

13   **A.**   Well, the agent showed up at my home, also.  And I was

14   there with my child.  So after everything settled, we had to

15   sit down and have a discussion, because I was unaware of

16   anything like this going on.  We sat down.  We had a

17   discussion.  He basically broke down crying and told me

18   everything that was going on at the time.  And he also

19   showed me some things on his phone.

20   **Q.**   Was that right after, or some time down the line, the

21   things on the phone?

22   **A.**   We talked about the issue, what happened, but then a

23   few -- maybe days after, weeks after, is when I saw the

24   actual video.

25   **Q.**   When you say video, what video are you referring to?

1  **A.**   So there was a very graphic video that I saw that was

2  sent of, basically, people being mutilated; someone having

3  their head cut off, type of thing.

4  **Q.**   Did he make you aware of who sent this video?

5  **A.**   Yes.

6  **Q.**   And who did he say -- who did he tell you sent the

7  video?

8  **A.**   The cartel.

9  **Q.**   Did there ever come a time in which you were personally

10 scared?

11 **A.**   Yes, definitely.

12 **Q.**   Please describe the situation or that situation.

13 **A.**   So after everything happened -- I live in a cul-de-sac.

14 So every car that comes down, we know.  But there was

15 several cars that started coming down.  And no one speeds in

16 that street because it's a cul-de-sac, and we have kids on

17 that street.  But several cars started coming down that

18 street speeding and going around the cul-de-sac and coming

19 back up, and kind of stopped in front of my home, and then

20 go.  And this started happening throughout the day.

21      So I said to my sister that I was going to get some

22 Ring cameras and install them, which I did.  And in doing

23 so, I was able to see over and over again the cars that

24 would come by and stop, just sit, and then go.  There were

25 also several phone calls that kept coming in.

1    **Q.**    Did you ever report the automobile activity?

2    **A.**    Yes.  I tried to call -- I contacted Agent Brumfield.

3    **Q.**    Did you speak to him?

4    **A.**    I did.  I spoke to him and -- I told him I needed to

5    talk to him, because there was several things that were

6    going on, and I was afraid, and things like that.  And he

7    told me to contact my lawyer.

8    **Q.**    Did there ever -- were there any other incidents that

9    caused you to be afraid?

10   **A.**    Yes.  There were several phone calls, daily.

11   **Q.**    Do you know any of the phone numbers?

12   **A.**    No.  It would be different numbers every time.

13   **Q.**    Did you ever answer the phone?

14   **A.**    I did not.  I did not answer the phone, because I was

15   afraid of answering a call and getting wrapped into

16   something that I would not be able to get out of.

17   **Q.**    What would make you think that these calls were from

18   someone -- that they would pertain to your husband's

19   situation?

20   **A.**    Because they were all coming from the same location.

21   They were all numbers from Arizona, which is where the

22   trouble started.  And, like I said, it was several times a

23   day.  And, I mean, not -- every time that they came through,

24   I would take a screenshot of the phone and forward them to

25   you, just, you know, asking for help, asking for protection.

1    I was afraid.  I was afraid I was being followed.  So, yeah.

2    **Q.**   Did your husband ever convey to you that he felt

3    coerced into his actions?

4            MR. WOLFE:  Objection, Your Honor.  The question

5    calls for hearsay.

6            THE COURT:  Sustained.

7    BY MR. MOORE:

8    **Q.**   Did he ever convey to you that he was afraid?

9    **A.**   Yes.

10           MR. WOLFE:  Objection, Your Honor.

11           THE COURT:  I just sustained the objection to the

12   same question, Mr. Moore.

13   BY MR. MOORE:

14   **Q.**   Did your husband ever have a conversation with you

15   about the people from Arizona?

16           MR. WOLFE:  Objection, Your Honor.

17           THE COURT:  Sustained.

18   BY MR. MOORE:

19   **Q.**   Did your husband ever have any conversations with you

20   concerning his arrest afterwards?

21           MR. WOLFE:  Objection, Your Honor.

22           THE COURT:  Sustained.

23       And unless you have further questions beyond that which

24   you've asked now four times, you may surrender the witness.

25           MR. MOORE:  I will do so willingly, Your Honor.

1          THE COURT:  Very good.

2          MR. MOORE:  Thank you.

3          THE COURT:  Ms. Jackson, you mentioned an agent to

4   whom you had spoken.  Could you repeat the name?

5          THE WITNESS:  Brumfield.

6          THE COURT:  How would you spell it?

7          THE WITNESS:  B-R-U-M-F-I-E-L-D, Brumfield.

8          THE COURT:  Something like Brumfield?

9          THE WITNESS:  Yes.

10          THE COURT:  Thank you.

11          THE WITNESS:  Yes.

12                      **CROSS-EXAMINATION**

13   **BY MR. WOLFE:**

14   **Q.**   Ms. Jackson, all the events that you described just

15   here speaking with Mr. Moore, those all started when your

16   husband got arrested; is that correct?

17   **A.**   Correct.  At least, I noticed after, yeah.

18   **Q.**   All the events, all the people in front of the

19   cul-de-sac, all the calls, all of that was after his arrest?

20   **A.**   Correct.

21          MR. WOLFE:  No further questions, Your Honor.

22          MR. MOORE:  No further questions, Your Honor.

23          THE COURT:  And may Ms. Jackson be excused once

24   again?

25          MR. MOORE:  Yes, she may.

1           THE COURT:  Thank you, ma'am.

2           THE WITNESS:  Thank you.

3           THE COURT:  Any further evidence on that issue?

4           MR. MOORE:  No, Your Honor.

5           THE COURT:  Does the government have any evidence

6     on the issue?

7           MR. WOLFE:  No, Your Honor.

8           THE COURT:  The Court will ask the parties to

9     argue the point.

10        And then I'm going to ask you to go back to argue,

11    after that's completed, the safety valve issue.

12        So commencing with this point on coercion, you're the

13    proponent of that, and you may make such statement as you

14    see fit at this point, Mr. Moore.

15          MR. MOORE:  Your Honor, may I ask a question,

16    please?

17          THE COURT:  Pardon me?

18          MR. MOORE:  There is also a proponent -- there was

19    also a motion concerning aberrant behavior, Your Honor.  Are

20    we going to address that prior to the argument or --

21          THE COURT:  With respect to aberrant behavior, I

22    think you can develop that in the course of your statement

23    to the Court in behalf of the defendant.

24          MR. MOORE:  Thank you, Your Honor.

25          THE COURT:  That is, unless you have evidence on

1    the point.  If you have evidence on that aberrant behavior,

2    we can consider that.  But let's address safety valve --

3    well, no, let's address coercion now, such as what we've

4    just heard.

5           MR. MOORE:  Your Honor, you read my motion, so I

6    know you're well aware of what the argument is as far as

7    coercion.  Your Honor, you know what it is.  You also know

8    there is a complete defense in coercion and an incomplete.

9        And in this case, I believe it would be an incomplete

10   defense.  I believe that it is enough to gain Mr. Jackson a

11   variance, Your Honor.

12       Mr. Jackson entered into this, according to the PSR,

13   and according to the statement he gave when he was arrested,

14   Your Honor, into this situation -- or agreement with these

15   people, from Day One, under coercion.  When he first spoke

16   with these people, he spoke with them with a gun on the

17   table.

18       He entered into a situation --

19           THE COURT:  Well, you're saying he spoke to them

20   with a gun on the table.  Where does that appear in the

21   evidence?

22           MR. MOORE:  It was based upon Mr. Jackson's

23   debriefing, Your Honor.

24           THE COURT:  Please go ahead.

25           MR. MOORE:  And that's how he entered into this

1    agreement, Your Honor.  His wife just testified to that.

2            THE COURT:  You understand the Court is not

3    considering the debriefing, because it has no part of it in

4    the record.

5            MR. MOORE:  I understand, Your Honor.  His wife

6    testified that he explained to her that he was scared.  He

7    explained to her that the beginning of the problems came

8    from Arizona.  She's testified that there were various cars

9    that she wasn't aware of driving up and down her street.

10   She even went so far as to attempt to contact the

11   authorities and ask for help.  She went so far as to send me

12   copies of the screenshots, which --

13           THE COURT:  You say, she attempted to contact the

14   authorities for help?

15           MR. MOORE:  Yes.

16           THE COURT:  There is no evidence that Mr. Jackson

17   did so; that is, her husband did so?

18           MR. MOORE:  No.  No, Your Honor.

19           THE COURT:  Please go ahead.

20           MR. MOORE:  No.  And I'm not going to say that he

21   did, Your Honor, because he didn't.  But she did screenshot

22   the calls.  And she did see the video.  And he did make her

23   aware of what the video -- who the video -- who sent the

24   video, Your Honor.

25           THE COURT:  Now, all this is taking place after

 1    the arrest?

 2         MR. MOORE:  After the arrest, Your Honor.  The

 3    video action -- it was seen by his wife after the arrest.

 4    But it existed prior to, Your Honor.

 5       I understand that coercion generally has to do with an

 6    individual being verbally threatened or something, some

 7    evidence that an individual can put on the table and say,

 8    this note was sent to me, or, this message was sent to me,

 9    but also understand that coercion and being forced into

10    something is generally something that is done in the dark.

11    So there is not often hardcore evidence, text messaging, and

12    so forth in these situations, Your Honor.

13       And given the magnitude, scale, and scope of the

14    organizations that he believed he was dealing with, Your

15    Honor, I don't think it's far-fetched to believe that based

16    upon even the actions that were taken afterwards, and given

17    his background and his history and so on and so forth, that

18    he operated without being coerced or under duress, Your

19    Honor.

20       I believe the entire situation was a situation which he

21    was forced into, and that they continued to force -- to

22    attempt to force the situation by intimidating his family

23    after his arrest, Your Honor.

24       And I believe if you take a look at that evidence and

25    the totality of the circumstances and all the evidence that

1    is presented to you in this case as a whole, I think that he

2    qualifies for a variance in this case, Your Honor.

3        That is it.

4            THE COURT:  Thank you.

5        Will you address the coercion point?

6            MR. WOLFE:  Yes, Your Honor.  The defendant's

7    demonstrated no entitlement or justification for a downward

8    variance based on coercion.

9        All the evidence that he's produced has been of events

10   taking place after his arrest.  He was involved in an

11   offense and relevant conduct in this case, beginning,

12   approximately, a year prior to his arrest.

13       This was a long-running operation.  And all the

14   evidence that we're hearing are things happening after his

15   arrest.  Even being as charitable as possible to those

16   things; they were vague.

17       And, again, the offense was completed by the time

18   anybody drove by Mr. Jackson's house, regardless of who they

19   were, by the time Mr. Jackson's wife got any missed calls,

20   regardless of who they were -- and we don't know who they

21   were, because none of the calls were answered -- there has

22   been no evidence adduced as to who those people were.

23       We don't know who the people were that were driving by

24   the house.  We don't know who the people were who were

25   calling, whether they had any connection to this offense or

1  to the defendant.  And even if they did, all of that

2  happened after the offense was completed.

3    It has nothing to do with his motivation for committing

4  the offense.  He's demonstrated no entitlement to a downward

5  variance on this point, Your Honor.

6    THE COURT:  What, if anything, do you make of the

7  evidence with respect to the video?

8    MR. WOLFE:  Your Honor, the defendant's wife

9  viewed the video after his arrest, but we have no evidence

10  as to the source of that, other than a hearsay statement;

11  and we don't know that the video was sent to him before his

12  arrest or any impact it may have had on him.

13    And so the defendant's demonstrated, again, no

14  entitlement to a variance on this point.

15    THE COURT:  Thank you.

16    MR. MOORE:  Your Honor?

17    THE COURT:  Continuing to conclude coercion.

18    MR. MOORE:  Your Honor, we admit that Ms. Jackson

19  has testified to things that she saw afterwards, because,

20  quite frankly, her husband kept her out of it.  However, the

21  video that she has alluded to was in the possession of the

22  United States Government.  They failed to download it.  It's

23  not our fault.

24    In addition, when you take a look at the revised PSR,

25  page 21, paragraph -- adjustment for acceptance of

1    responsibility, page 21, top of the page, in the PSR, Mr.

2    Jackson has actually told them that the way he became

3    involved in this was selling defective phones to a Mexican

4    cartel, and they required him to make good on the issue that

5    they caused them.  That is at the top of the page, of page

6    21.

7         So the fact that she can only testify to what she knew

8    about after the fact is just to bolster the allegations or

9    the testimony, the facts that Mr. Jackson gave when he was

10   actually asked about the situation in his PSR, Your Honor.

11        So this is not something that came about afterwards.

12   It's just something she knew about afterwards.  And she

13   supplied information on the ongoing coercion and threats

14   that were made, Your Honor.

15             THE COURT:  I believe that covers that topic.  And

16   I'll ask you -- unless you have something further on the

17   point, Mr. Wolfe?

18             MR. WOLFE:  Your Honor, I would just point out

19   that the acceptance of responsibility statement that Mr.

20   Moore pointed to at the top of page 21 of the PSR doesn't

21   say anything about the defendant being forced to do

22   anything; doesn't say anything about him being coerced to do

23   anything.

24        The quote, which begins on page -- on Line 4, of the

25   acceptance of responsibility statement, states, quote,

1    "I agreed to sell the drugs that they would supply in order

2    to repay the costs of the phones and money they allege they

3    lost due to defective phones."

4         Again, that's not evidence of coercion, Your Honor.

5              THE COURT:  With respect to that same matter, the

6    defendant's phone was seized, as I understand it, correct?

7              MR. WOLFE:  Several phones were seized from the

8    defendant's possession, Your Honor.

9              THE COURT:  Pardon?

10             MR. WOLFE:  Several phones, Your Honor.

11             THE COURT:  And what did the examination of those

12   phones show that would support coercion?

13             MR. WOLFE:  Nothing, Your Honor.  The phone that

14   was -- the United States sought a search warrant for a

15   Samsung cell phone that I believe was in the defendant's

16   possession when he was arrested on August 29th, 2022.  And a

17   thorough examination of that phone was conducted.  There was

18   no evidence of any communications with any cartel members or

19   associates in that phone.

20        The relevant text messages that were contained in that

21   phone were with suspected Chinese suppliers, and those are

22   the text messages that are set forth in the PSR.  There were

23   several other phones that were not downloaded, Your Honor.

24   Those were all returned to the defendant.

25             THE COURT:  Thank you.

1    And back on that same topic, anything on the phones

2    that supports the defendant's coercion contention?

3          MR. MOORE:  Are you asking me, Your Honor?

4          THE COURT:  What would be on the phones that would

5    support it?

6          MR. MOORE:  We would contend that the videos were

7    on the phone.  We no longer have the phone.  The phones were

8    destroyed or disposed of.  We have no idea exactly what

9    happened to them, Your Honor.  But the contention is that

10   the videos that we were described by his wife, those were on

11   the phone, Your Honor.  Several messages were on the phone,

12   Your Honor.  There were tracking numbers on that phone, Your

13   Honor.  There were --

14         THE COURT:  Well, who are the messages you're

15   referring to?  First of all, one of them seems to be put at

16   rest, and that is, there were nine scam messages that were

17   determined to be scam messages coming from either Grand

18   Canyon University or an organization related to it.  And

19   there was a ninth one -- that took care of eight of them --

20   and there was a ninth one that was determined, also, to be a

21   marketing scam, a message.

22    Aside from that, what is there on the phone that

23   supports coercion?

24         MR. MOORE:  The phones in which I believe you're

25   alluding to were phones that were destroyed.

 1          I have no idea -- I have no idea of anything else that

 2     was on the phone other than what I've been told, and what

 3     Ms. Jackson has testified to, Your Honor.

 4          THE COURT:  Thank you.

 5          Anything further on coercion?

 6          If not, Mr. Wolfe are we finished with that?

 7          MR. WOLFE:  Yes, Your Honor.

 8          THE COURT:  Let's go to safety valve.

 9          MR. MOORE:  Your Honor, in order for a defendant

10     to be eligible -- in order for the defendant to be

11     eligible --

12          THE COURT:  Try it again.

13          MR. MOORE:  Your Honor, in order for the defendant

14     to be eligible for the safety valve, there are certain

15     criteria that must be met.  You can't have more than -- I

16     believe it's now four.

17          THE COURT:  I understand we are not dealing except

18     with one or two of those that are at issue.  And what I want

19     you to do is to face that which is at issue, and one is

20     firearm.

21          MR. MOORE:  Your Honor, in order to be eligible

22     under the Safety Valve Act, you can't have a firearm that is

23     associated or used in furtherance of the actual criminal or

24     drug activity in this case, Your Honor.

25          And I believe, based on the evidence presented, it's

1    quite clear that, by a preponderance of the evidence, these

2    guns were possessed -- based on the testimony taken today,

3    these guns were possessed years -- several years prior to

4    any alleged activity at all in this case, Your Honor.

5        I know that the mere presence does invoke the two-point

6    enhancement.  And we accept that, Your Honor.  But I also

7    know that there is a difference in terms of whether or not

8    the burden of proof -- in the burden of proof for providing

9    the Safety Valve Act versus the enhancement.

10       And in this case, it's quite clear, based upon the

11   evidence and based upon testimony given today, that these

12   guns were obtained years prior.  They were held for simple

13   family activities, friend activities.  For reasons that we

14   all -- I don't know about everybody, but the majority of us

15   probably have a gun due to the Second Amendment to protect

16   our home and family, Your Honor.

17       And that is what has been discussed and testified to

18   today, Your Honor.

19       At no time did Mr. Jackson possess these firearms in

20   furtherance of or in any connection actually with the drug

21   activity, other than mere presence of them being there.

22       In fact, during the entire investigation, the entire

23   investigation, Your Honor, if you look at his actual home,

24   which is in South -- I'm sorry -- South Charleston, ███████

25   Way, very rarely do you have any visitors.  The apartment

1    where the majority -- or where the drugs were actually

2    stored, very rarely, if any, did he have any visitors.  No

3    one was aware of his activities.  There was no reason for

4    him to have guns to protect the illegal activities, Your

5    Honor.

6         In fact, he -- based on the evidence I've been given,

7    he didn't even reside at that apartment 80 to 90 percent of

8    the time.  So even if the guns were there, along with the

9    drugs, he couldn't have protected the money, the drugs, or

10   anything else, because he just wasn't there.  They just

11   happened to be stored in the same place, the same facility,

12   Your Honor.

13        So, I believe, based on the preponderance of the

14   evidence, that it's very easy to see that these guns were in

15   no way connected to the actual criminal activity, as often

16   is the case, Your Honor; they just happened to be there.

17             THE COURT:  Is it correct that the two handguns at

18   the apartment were loaded; whereas, the rifle and the

19   shotgun and the other weapon at the residence were not?

20             MR. MOORE:  Yes, Your Honor, I believe so.

21             THE COURT:  Thank you.

22        Mr. Wolfe.

23             MR. WOLFE:  Your Honor, the defendant's possession

24   of the two pistols at his ███████ Street apartment foreclosed

25   safety valve eligibility in this case.

1      The pistols, as the Court noted, were loaded.  They

2  were in a bedroom that contained pills containing controlled

3  substances, as well as a digital scale, adjacent to another

4  bedroom on the same floor with thousands of pills containing

5  a controlled substance were in that adjacent bedroom, within

6  an apartment that was used as a workshop for the defendant

7  to manufacture pills; ultimately, more than 10,000 of them,

8  and containing numerous pieces of equipment designed for

9  that purpose.

10      The handguns were certainly proximate to mountains of

11  evidence of the defendant's drug operation.

12      The witnesses that testified here this afternoon didn't

13  know anything about the defendant's drug activities.  They

14  didn't discuss it with him.  They had no knowledge of it

15  prior to his arrest.  They didn't know how he may or may not

16  have used drugs or used guns in furtherance of his drug

17  activities.

18      And under those -- none of those witnesses could

19  specifically recall even being in the apartment within a

20  year prior to his arrest, which is when all the evidence

21  came forth of his involvement in this drug, this fentanyl

22  operation.

23      One of the common threads between all those

24  witnesses -- they testified that those guns were for

25  protection, but the defendant didn't live at the apartment.

1    He lived in South Charleston, at a different home with his

2    family, and there were guns there.

3         The defendant's choice to store these guns proximate to

4    the other drug evidence is telling, especially, since his

5    family didn't live in that apartment.  That was a place that

6    he conducted his drug activities, among, perhaps, other

7    things.

8         But protection is precisely the reason why drug dealers

9    generally possess guns; and, more specifically, they often

10   possess pistols for that purpose.  These were two loaded

11   pistols.

12        The case law is very clear that pistols are a tool of

13   the drug trade; that they are well-suited to close-quarter

14   self-defense, which is exactly the purpose to which these

15   loaded pistols could be readily and easily put to.

16        Also, the digital scale located in the same room as the

17   pistols is another recognized tool of the drug trade.

18        The defendant cannot show, as is his burden by a

19   preponderance of the evidence, that these guns had no

20   connection to his drug trafficking activities; therefore, he

21   doesn't qualify for the safety valve, simply because of the

22   possession of these guns, without even getting to the

23   truthfulness requirement.

24              THE COURT:  Thank you.

25        Mr. Moore.

1      MR. MOORE:  The fact that these handguns were

2 there, and given the fact that several people testified that

3 they were aware there were handguns in that apartment years

4 prior to the drug activity, Your Honor, does not preclude

5 him from maintaining them in that apartment, Your Honor.

6      The fact that they were loaded -- the fact -- whether

7 they were loaded or unloaded, Your Honor, it does not

8 connect him, necessarily, to the drug activity that was

9 going on in the apartment.

10      He -- I think his wife testified that they were

11 separated for some time, Your Honor.

12      So, yes, he has a right to maintain a firearm to

13 protect himself, as well as his family, and not only the

14 home in South Charleston, but in the residence in St.

15 Albans, which, apparently, he did stay there some time, and

16 at least from 2005, forward, it was his home.  And he

17 always, based on the testimony, has maintained a firearm in

18 that same apartment, Your Honor.

19      So for the government to suggest that he maintained

20 those guns for the specific purpose of protecting drugs or

21 money or such is not necessarily true.

22      And even based upon a preponderance of the evidence,

23 Your Honor, it's easy to see that these guns and the drugs

24 don't necessarily have a connection; that they

25 really probably don't have a connection; that the guns

1    out -- far outdate the drug activity, Your Honor.

2        So, based upon that, I don't believe that he should be

3    denied the Safety Valve Act in this case, Your Honor.  The

4    guns clearly existed for family protection, existed prior

5    to, for family protection and for innocent family and friend

6    activities, such as shooting at the Kanawha State Forest,

7    Your Honor.

8            THE COURT:  Thank you.

9        Anything further, Mr. Wolfe?

10           MR. WOLFE:  No, Your Honor.

11           THE COURT:  The Court has not asked the

12   government, but I will now, do you have any objections to

13   the Presentence Report?

14           MR. WOLFE:  No, Your Honor.

15           THE COURT:  Do the parties have anything further

16   before the Court makes its findings on the issues presented?

17           MR. WOLFE:  No, Your Honor.

18           MR. MOORE:  No, Your Honor.

19           THE COURT:  The Court finds by a preponderance of

20   the evidence that the Stipulation of Facts attached to the

21   plea agreement contains within itself a number of matters

22   which the Court makes as its findings, and they are as

23   follows:

24       As they are from the Stipulation of Facts, to which the

25   defendant has, of course, admitted by both his signature and

1    his acknowledgment at the guilty plea hearing.

2        Referring to the apartment located at ███ ██████

3    Street, in St. Albans.  "On August 29, 2022, law enforcement

4    officers searched my apartment.  Inside, they found various

5    quantities of pills, which I had pressed and imprinted with

6    "M30" markings to make them look like

7    legitimately-manufactured 30-milligram Oxycodone pills.

8    Some of these pills contained fentanyl, and others contained

9    Protonitazene or Butonitazene.  Officers also seized

10   various quantities of powder containing these substances, a

11   large quantity of cash, two loaded pistols, pill press

12   equipment, various punch and die kits used to imprint pills

13   with "M30" markings, powder mixing equipment, and various

14   binding powders used to create pill tablets."

15       "By that date," -- being August 29, 2022 -- "I was

16   acquiring fentanyl powder from a source outside the United

17   States and commercially-manufactured binding powder from a

18   company in the United States.  I had also acquired "M30"

19   punch and die sets from China.  I used all these powders and

20   equipment to create pills that appeared to be legitimate

21   Oxycodone 30-milligram pills, but which, in fact, contained

22   fentanyl or similar substances."

23       "I used my apartment, primarily the basement of the

24   apartment, as a workshop for making these pills."

25       "I intended to distribute the pills that I had created

1    in my apartment.  A package that I placed in the United

2    States mail on August 9, 2022, that was destined for

3    Connecticut, was intercepted by law enforcement and

4    searched.  Inside the package, officers found several

5    hundred pills that I created in my apartment."

6         According to paragraphs 24 and 25 of the Presentence

7    Report, the Court will add that the pills just referred to

8    were blue tablets marked with an "M" -- or -- or, I should

9    say, marked with an "M" and the figure "30," and they were

10   designed as if they were Oxycodone, but indeed, were

11   instead, Protonitazene.

12        The Court further notes that, as a result, it concludes

13   upon finding that the defendant knowingly misrepresented and

14   knowingly marketed as Oxycodone a mixture or substance

15   containing fentanyl or a fentanyl analogue, by reason of

16   which the four-level enhancement applies.

17        The Court further finds by a preponderance of the

18   evidence that the defendant possessed the loaded Glock and

19   Smith & Wesson .40 caliber handguns found at the ████

20   Street apartment, and did so in connection with the offense,

21   which the defendant, by counsel, has today acknowledged.

22        And that was done, the Court finds, to protect the

23   defendant himself, should he be attacked while engaged at

24   the apartment in furthering the manufacturing and

25   distribution of the tablets designed as Oxycodone, but

1  containing fentanyl.  And he did so to protect his

2  possession of the fentanyl pills, and the substantial cash

3  of some $79,000 found there.

4      Having so found by a preponderance of the evidence, the

5  Court concludes that the defendant has not qualified for

6  safety valve.

7      With that, the Court would ask the parties whether or

8  not you have anything further with respect to the findings

9  of the Court before proceeding?

10         MR. WOLFE:  No, Your Honor.

11         MR. MOORE:  Yes, Your Honor.  The Stipulation of

12  Facts which you read, I believe, is overly broad; not

13  specific enough for you to make the findings that you've

14  made.  I believe that when you read the Stipulation of

15  Facts, and discuss making and binding powders and so on and

16  so forth, I think that should be read in conjunction with

17  the statement that was given by my client and explanation

18  therewith.

19      I know you don't have those in hand, Your Honor.  But

20  the assumptions --

21         THE COURT:  Mr. Moore, are you talking about

22  evidence that is not in the record?

23         MR. MOORE:  You're correct, Your Honor.  I

24  understand your findings, and I'll accept them at this time,

25  Your Honor, but just note my objection.

1          THE COURT:  Very good.

2      And there being nothing further with respect to those

3  matters, I want to turn now to the supervised release

4  conditions.  Those are set forth in the Presentence Report.

5      The Court would expect to impose as conditions of

6  supervised release those conditions that, of course, are

7  mandatory, as well as the conditions that are found in

8  Administrative Office 245, as well as those conditions that

9  are standard by Local Rule, all of which are set forth in

10  the report.

11      And in addition to that, the Court would impose this

12  special condition that the defendant shall submit his or her

13  person, property, house, residence, vehicle, papers, or

14  office to a search conducted by the United States Probation

15  Officer when there is reasonable suspicion that the

16  defendant has violated a condition of supervision.

17      Prior to the search, the Probation Officer must obtain

18  approval of the search from the Court.  The search must be

19  conducted at a reasonable time and in a reasonable manner.

20  Failure to submit to a search may be grounds for revocation

21  of release.  The defendant shall inform other occupants that

22  the premises may be subject to searches pursuant to this

23  condition.

24      I would ask the parties whether or not you are in

25  agreement that all of those conditions of supervised release

```
 1    that I've just referred to are appropriately adopted in this

 2    instance?

 3              MR. WOLFE:  The United States agrees, Your Honor.

 4              MR. MOORE:  Defense agrees, Your Honor.

 5              THE COURT:  And I would ask whether or not, even

 6    beyond that, Mr. Moore, do you have any question about any

 7    of them?

 8              MR. MOORE:  I'm sorry, Your Honor.  I couldn't

 9    hear it all.

10              THE COURT:  Pardon?

11              MR. MOORE:  I could not hear your entire question.

12              THE COURT:  I said, do you have any questions

13    about any of them?

14              MR. MOORE:  No, no.

15              THE COURT:  Thank you.  And I would ask, also,

16    have you been over with the defendant all of those

17    conditions?

18              MR. MOORE:  We have, Your Honor.

19              THE COURT:  And, Mr. Jackson, are you agreeable to

20    them, as well?

21              THE DEFENDANT:  Yes, Your Honor.

22              THE COURT:  Thank you.

23         I understand, also, that the $100 Special Assessment

24    has been paid.  Is that correct?

25              MR. MOORE:  Yes, Your Honor.
```

 1          THE COURT:  And I would ask then, do the parties

 2     have anything further before proceeding to hearing you with

 3     respect to sentencing?

 4          MR. WOLFE:  Nothing at this point, Your Honor.

 5          MR. MOORE:  Nothing, Your Honor.

 6          THE COURT:  Are the parties in agreement that

 7     based on the Court's findings, the Total Offense Level in

 8     the case is that of 35, with a Criminal History Category of

 9     I, and that yields an advisory guideline range for

10     imprisonment purposes of 168 to 210 months in this case,

11     which it carries with it, as you know, a mandatory 10-year

12     sentence, with a term of supervised release being not less

13     than five years, and as long as life?

14     Are the parties in agreement?

15          MR. WOLFE:  Agreed, Your Honor.

16          MR. MOORE:  We are, Your Honor.

17          THE COURT:  Thank you.

18     And with that, Mr. Moore, have you anything you would

19     wish to say in the defendant's behalf?

20     I should ask you first, do you see any reason why

21     sentence should not now proceed?

22          MR. MOORE:  No, Your Honor.

23          THE COURT:  And, Mr. Jackson, do you see any

24     reason why sentence should not now proceed?

25          (An off-the-record discussion was held between defense

1    attorney Moore and the defendant.)

2              THE DEFENDANT:  No, Your Honor.

3              THE COURT:  Thank you.

4         And, Mr. Jackson, you may be seated.

5         Mr. Moore, have you anything you'd wish to say in

6    behalf of Mr. Jackson?

7              MR. MOORE:  I do, Your Honor.

8         You've read my motion concerning aberrant behavior, and

9    you know exactly what it is.  You probably know the

10   Sentencing Guidelines probably better than anybody in this

11   building.  And I've been doing this since 1996, '97, and

12   I've never seen this many letters or this much show of

13   support for any individual.

14             THE COURT:  And let me interrupt and ask, the

15   Court has received 41 letters.

16             MR. MOORE:  Yes.

17             THE COURT:  And I would assume the parties have

18   seen them all.

19        Mr. Wolfe, is that correct?

20             MR. WOLFE:  Yes, Your Honor.  I have seen that

21   number of -- sounds correct -- several letters.  I reviewed

22   them.

23             THE COURT:  And would the parties be in agreement

24   that all those letters be made a part of the record in this

25   case?

1          MR. WOLFE:  Yes, Your Honor.

2          MR. MOORE:  Yes, Your Honor.

3          THE COURT:  And the Court does so.

4      Please excuse the interruption.  Go ahead.

5          MR. MOORE:  Your Honor, I've never seen this much

6   support for an individual in this matter, in a legal matter,

7   just period.  The letters range from even incarcerated

8   individuals.  I was walking in the hall, one of them gave me

9   a letter.  And you have that letter, Your Honor.  You have

10  members of the bar, attorneys -- more people that would fit

11  in this room.  If you had called, I would have asked Mr.

12  Elliott Hicks, who is a local attorney, well-respected, who

13  would have testified as to the character of this defendant,

14  and in regards to this being his -- his behavior being

15  aberrant in nature, Your Honor.

16      And you've been a judge longer than I've been alive.

17  You've seen this situation.  It's a circle.  It happens over

18  and over.  You've got marijuana.  Oh, let's incarcerate

19  them.  Then there was crack -- well, first, it was heroin,

20  and then it was crack.  Let's up the guidelines, and let's

21  incarcerate them.

22      And the Sentencing Guidelines and the table has sought

23  to reduce an individual to numbers.  And then we come to

24  Section 3553, which does its best to interject some humanity

25  into the situation, because we all know that overly

1    incarcerating people, it just didn't work.  And it is still

2    not going to work.  Period.

3        So to take a look at the guidelines, and this single

4    situation and weigh it against 42, 43 years of life that has

5    been positive, and everything a positive person could ask

6    for in his community, and say, wow, it outweighs everything

7    he has done, and everything that he stood for prior, just

8    doesn't make sense.

9        To -- if anybody -- I know you've made a decision --

10   deserved the safety valve, it's him, you know, bottom-line.

11       The requirements of 3553, you know them, so I'm not

12   going to sit here and repeat them, but I'm going to ask you

13   to take a look at the number of people who support him in

14   this room.  42 years -- 43 years of life, positive, the lack

15   of a criminal history.  The over-incarceration of

16   individuals.  And that's one reason that the guidelines are

17   no longer even mandatory.

18       And, you know, do what they don't do, and seek -- you

19   know, and ask for justice, some type of humanity; not how

20   many years can I put a man in jail.  You know, that's not

21   what this is supposed to be about.  But that's what it seems

22   to be, every time I come in this courtroom.

23       What he did was wrong.  He could have hurt somebody.

24   But in a six-month investigation, he didn't make a single

25   sale.

1      It was a lot of money in that room.  But just because

2  there is a lot of money in that room doesn't mean that it

3  came from anything illegal.  They couldn't even attribute

4  that as relevant conduct in his PSR.

5      Simply because what happened, and the things went down

6  that didn't fit their narrative, doesn't mean that he didn't

7  tell the truth.

8      And he told the truth from the day he was arrested, and

9  he's still telling the truth today.

10      I'd ask you to take a look at those things, and his

11  prior history, his support in the community, and fashion

12  what is necessary under 3553, a sentence that is reflective

13  of all of those things, but, more importantly, who he is,

14  and the fact that this is a blip, an aberration, in the

15  otherwise stellar -- 44 -- 45 now -- 44-year life.

16      Not a single pill entered this community.  And all the

17  money -- there was not a dime went into the apartment.  All

18  the money went out.  There was seizure of money going out;

19  nothing coming in.

20      And I guess their assumption is that he was going to

21  sell these and do this and destroy our community.  It never

22  happened.  He never intended for it to happen.

23      He was put in a situation in which he had to make

24  decisions and swim in a pool in which he had never been in.

25      And if that was his intent, that would have been easy.

1    I mean, 10,000 pills in a state with the highest overdose

2    rate in the United States, for him to find people to sell

3    those pills to and destroy our community, that would have

4    been simple.  That would have been like giving water to

5    somebody in a desert.  And he didn't do it.

6        So I think that all of that should be given weight, and

7    to far outweigh any recommendation made by some individuals

8    in some buildings that come up with numbers that have no

9    real value, other than this is what they think a person

10   should go to jail for.

11       You have the evidence of those letters.  You have the

12   support of his community.  And you have an opportunity to

13   weigh a man, not a number, in terms of giving him his time.

14       So with that, I'd ask you to, at the very least, give

15   him the bottom of the guidelines, and consider the fact that

16   this is aberrant behavior that he should be given credit

17   for, and fashion a sentence that will give him an

18   opportunity to come home and continue the otherwise stellar

19   life that he has lived for 44-some-odd years, raising his

20   kids and helping them.

21           THE COURT:  Thank you.

22       Mr. Wolfe.

23           MR. WOLFE:  Your Honor, this case was exceptional

24   in many respects.  And some of them Mr. Moore has already

25   mentioned.  Some positive, some negative.

1          The defendant, undoubtedly, has a lot of support.

2     There is no debate about that.

3          And that will certainly help him when he is released.

4     He also has no meaningful prior run-ins with law enforcement

5     before this case.  And it's somewhat exceptional to see

6     somebody well into their 40s getting involved in drug

7     trafficking at this level with no history of the same.

8          At the same time, this case is also exceptional in

9     terms of the operation the defendant had built in his

10    apartment; the complexity of the equipment he had gathered;

11    the number of pills he accumulated, that were seized when an

12    officer searched that apartment, over 10,000 of them.

13         The evidence in this case, as summarized in the PSR,

14    speaks of an operation that lasted for several months.  This

15    case is also exceptional in terms of the efforts of law

16    enforcement, specifically, the DEA, that prevented those

17    10,000-some pills from entering into this community or

18    others like it.

19         And it's well-known throughout the country that these

20    pills containing fentanyl, bearing the "M30" markings, have

21    caused overdoses throughout the country.  And I cited to

22    some examples of that and various district court's decisions

23    in the United States Sentencing Memorandum.

24         This case is also exceptional in terms of the need for

25    this sentence to deter not only this defendant, but others.

1    This is a unique case.  I've never seen a case where

2  somebody locally was involved in pressing pills containing

3  fentanyl.

4    I'm certainly aware of many instances of those pills

5  being seized in this district.  And certainly fentanyl is an

6  issue in this district that dwarfs any previous drug issue

7  this district has confronted, marijuana, cocaine, crack

8  cocaine, methamphetamine -- none of those substances cause

9  death at the rate at which fentanyl has caused death here

10  and elsewhere.

11    This case involved a substantial amount of fentanyl in

12  a form that was particularly deadly, given the misleading

13  markings on the pills, the number of overdoses that pills

14  likely have caused throughout the country.

15    Those pills, had law enforcement not intervened, would

16  have entered into the stream of commerce at some point,

17  whether by the defendant's hands or somebody else's.  He did

18  not make them to use them.  They were made with the intent

19  that somebody down the line would use them.  And perhaps

20  many deaths were prevented by these pills being seized.

21    That conduct needs to be deterred.  Any time somebody

22  is selling fentanyl, it needs to be deterred.  But

23  possessing with intent to distribute, as the defendant has

24  admitted, this many fentanyl pills, each one being, in

25  effect, a wolf in sheep's clothing, given the marking, could

1    have caused countless deaths.

2         Deterrence is paramount.  The need to craft a sentence

3    commensurate with the seriousness of this offense is

4    paramount.  The need to impose a sentence that constitutes

5    just punishment is paramount.

6         This was a very serious offense.  It could have caused

7    countless deaths.  A sentence should be certainly within the

8    guideline range, near the top of that range, to match the

9    seriousness of the offense, and the other sentencing

10   factors, Your Honor.

11             THE COURT:  Thank you.

12        Mr. Moore, in light of the government's comments, have

13   you anything further?

14             MR. MOORE:  Well, yeah.  I guess it could have

15   happened.  But the point is, it didn't happen.  And it

16   wasn't going to happen.  It just -- as I said earlier, if he

17   had intended to sell these in this community, it's like

18   taking water to the desert.  Half of our valley would have

19   been dead.  But he didn't.

20        This is a six-month investigation.  They don't have a

21   single person he sold to.  Not one.

22        They questioned about the large amounts of money at the

23   house.  But the only money they ever retrieved was money

24   going out; not going in.

25        When they say he pressed these pills -- he pressed some

1    of them, but they know the rest of the story.  And I don't

2    think they're giving you the full story.

3        It's not necessary to give him a sentence anywhere near

4    that which is suggested -- the guideline range suggested

5    for him, to understand that what he did was wrong.  He

6    understands now.

7        If the government felt that he was such a threat that

8    he needed that much time in jail -- he was arrested a year

9    prior to them ever indicting him.  He was free.  They let

10   him go.  They arrested him and let him go.

11       Nothing happened.  He didn't commit a single crime.  He

12   didn't go anywhere without asking.  They were even in

13   agreement that when you took him into custody that he could

14   remain free on bail.

15       So by their own actions, they admit that he probably

16   has learned his lesson, and he doesn't need such a strenuous

17   sentence, Your Honor.

18       Based upon that, and his character, and his -- and

19   evidence presented, which does not show him selling anything

20   or being a danger to the community -- I know they are going

21   to argue that the mere possession of, which is dangerous.

22   It was.  It was dangerous to him, because he didn't give it

23   to anyone else.

24       He accepted that responsibility himself, Your Honor.

25       And, you know, based upon that, I'd ask you to fashion

1    a sentence based upon the man, and not the numbers, you

2    know.  And he'd argue that this -- nobody -- nobody --

3    people have -- we haven't had as many deaths from any other

4    drug than due to fentanyl.

5        I was here during the crack epidemic.  They made the

6    same argument.  So what he's asking for you to do is

7    over-sentence a person based on a societal situation, rather

8    than who he is, Your Honor.

9            THE COURT:  Thank you.

10       Mr. Jackson, have you anything you'd wish to say in

11   your own behalf, whether by way of mitigation of punishment

12   or otherwise?

13           THE DEFENDANT:  Yes, Your Honor, I would like to

14   speak.

15           THE COURT:  Speak straight out.

16           THE DEFENDANT:  Your Honor, there has been some

17   statements made here that I brought it -- and I didn't agree

18   to.  I sat down with them a little bit ago, and I tried to

19   clear some things up.  I did not intend to sell a single

20   pill, sir.  I was under the threat of the Mexican cartel

21   from Arizona.  They wanted me to sell the pills.

22       I refused, because I know the damage that they do.

23   There is no way that I could look my family in the face and

24   say that I sold somebody pills, and that person died.  I

25   cannot do that, sir.  There is no way.

1    I put my own life at risk to save other lives.  There
2  were 10,000 pills, yes.  They were multiple packages sent to
3  me.  And I refused to sell a single pill.  I can't do that,
4  sir.  It's not my character.
5    I accept responsibility for my actions.
6    My family has suffered greatly.  My conscious -- my
7  conscious cannot allow me to just sit here and be silent
8  while they just try to slander me, sir.  Like, I'm not that
9  person.  They're making me out to be a monster.  And I'm not
10  a monster.
11    As I said before, I had no intention to sell a single
12  pill, and I did not sell one single pill.
13    I possessed them, yes, but I never -- there was never a
14  time when I was going to distribute them.  Never.
15    I want to apologize to my family.
16    Even under the threat of violence, I should have
17  remembered who I am.  Most importantly, I should have
18  remembered whose I am.
19    I want to apologize to my church community.  I should
20  have trusted in the Lord with all my heart.  I should not
21  have left it to my own understanding and should not have
22  tried to take this on by myself.
23    I want to apologize to my fellow Freemasons, and my
24  fellow good Brothers of Omega Psi Phi.  Between those
25  organizations, I should have found somebody to confide in,

1    no matter the repercussions.

2          I want to apologize to my beautiful, wonderful wife, my

3    strong, handsome, oldest son, and my bonus son, my youngest

4    son.

5          You know, I thought that as long as I didn't sell any

6    pills, that no family or no community would be affected.

7          I now understand that's the furthest thing from the

8    truth, for my family was affected greatly because of that.

9          You know, in 42 years, I didn't commit any crime.  I

10   tried to live a good life, one where my kids could emulate

11   and be proud of their father.

12         And rest assured, nothing like this will ever happen

13   again.

14         Honestly, Judge, I really don't know what more I could

15   have done.  I thought I did all I could do.  I saved my life

16   and I saved countless other lives by not inflicting pain and

17   hurt, evil and death, on my community.  Again, I sacrificed

18   my life.  And I thought it was going to end.

19         And honestly, I would rather that happen than me sell

20   drugs, especially those fentanyl pills, and my family have

21   to look at me in shame.  I would rather have faced death

22   than that.

23         I want to thank everybody here for supporting me.  You

24   all know me.  And I appreciate the love.

25         Your Honor, Mr. Wolfe, Mr. Fidler, Mr. Thompson, I

1  humbly, and would --

2  　　　　　THE COURT:  Thank you, sir.

3  　　　　　THE DEFENDANT:  I'm not done.  I humbly, and with

4  the utmost and deepest respect, ask you all to allow me to

5  return to my family.

6  　　I am so sorry.  But God is still good.

7  　　　　　THE COURT:  Thank you, Mr. Jackson.

8  　　Mr. Jackson, the magnitude of your manufacturing and

9  distribution of pills containing fentanyl disguised as

10  Oxycodone is extraordinary.  Paragraph 36 of the Presentence

11  Report reflects the seizure, likely, on August 29, 2022, of

12  a total of 1,060 grams of fentanyl in products that are

13  either fentanyl or laced with fentanyl.

14  　　That equates to one-million, sixty-thousand milligrams.

15  　　In your conversation with an individual named Erin,

16  from whom you were attempting to buy fentanyl, on April 8,

17  2022, Erin warned you that, and I quote, "If you use too

18  much, you'll die," end quote.

19  　　To which you responded:  "Understood."

20  　　Erin then said, "2 milligrams can kill adults."

21  　　To which you again responded:  "Understood."

22  　　But we know you shipped out your poisonous product,

23  nevertheless, as indicated by the August 9, 2022 seizure of

24  the parcel that was headed for Connecticut.

25  　　And so, the gravity of the offense is immense.

1      You seem regretful, but you don't seem to appreciate
2  what you've done.
3          THE DEFENDANT:  Can I just -- I don't mean to
4  interrupt, Your Honor.  May I address that?
5          THE COURT:  Please go ahead.
6          THE DEFENDANT:  Okay.  Your Honor, I didn't -- I
7  did not manufacture -- I did not manufacture the -- the
8  scope that they were talking about, sir.  That was not me.
9      The conversation that was taking place with Ms. Erin,
10 that was navigated through the cartel.  That was a
11 screenshot that they gave me to try to get that.  I never
12 received anything like that.  I did not -- I did not press
13 any fentanyl pills, sir.  I did not do that.
14         THE COURT:  Thank you.
15     Anything further?
16         THE DEFENDANT:  As far as the package, yes, sir, I
17 sent the package out, but they told me to send that package
18 out.  They gave me an address to send that to and the return
19 address.  The return address was the apartment next to my
20 grandmother's house.  I did not receive any money for that,
21 Your Honor.  Like, no; no, sir.  That is not how that
22 happened.
23     I did not -- I did not manufacture 10,000 pills, sir.
24 I did not.
25     I received those.  I received those pills in the mail.

 1    I did not manufacture those, sir.

 2            THE COURT:  Continuing, the Court notes, as well,

 3    your willingness, indeed, eagerness to be involved in this

 4    conduct is reflected over the text of conversations

 5    intercepted during what looks to be a period of about eleven

 6    months, when you may have been engaged in gathering together

 7    the elements that permitted you to go through this conduct.

 8    Those conversations uniformly appear to be one of desire to

 9    accomplish a given end.  They do not reflect fear or

10    concern.

11        And so the Court necessarily takes all that into

12    account in determining the sentence that should be imposed

13    in this matter.

14        On the other hand, I recognize that until you commenced

15    engaging in this conduct, you had led a very productive

16    life.

17        You are highly respected.  Indeed, we have a number of

18    individuals here, such that it overflows the Court's

19    capacity here in your behalf.

20        That was true, as well, of the some 41 messages that I

21    received in your behalf.

22        Uniformly, those messages reflect a kind and generous

23    individual, who has given much to your community, and

24    expressed your love in many, many ways, in aid to you,

25    friends, and family, and church and community.

1    And so the Court necessarily takes that into account.

2    And it's reflected, as well, by the fact you have no

3    criminal history.

4        When the Court takes all of those factors into

5    consideration, and noting that the advisory guideline range

6    is that of 168 months to 210 months, and, of course, as you

7    must know, you're faced, in any event, with a mandatory

8    minimum of 10 years' imprisonment, the Court undertakes to

9    fashion a sentence that takes into account your personal

10   characteristics, the characteristics of the offense.  The

11   Court, of course, undertakes to impose a sentence that will

12   protect the public from further criminal conduct on your

13   part, as well as one that will deter others, including you

14   from engaging in like conduct.

15       And I would pause to note that the Court believes that

16   you must have learned your lesson from this unfortunate

17   experience, and that it's unlikely that you will engage in

18   further criminal conduct once released.

19       The Court takes into account, as well, all of the

20   facets of your life, as reflected not only in those letters,

21   but to some extent in this Presentence Report, as well.  And

22   I've concluded the sentence that the Court will reach, which

23   I'll note in a moment.

24       The Court also is going to place you on supervised

25   release for a period of five years.  And the Court will make

1    the conditions of that supervised release all those terms

2    and conditions that have already been considered, and that

3    is, all of the terms and conditions that are mandatory, all

4    the terms and conditions that are expressed in AO245, and

5    all of the terms and conditions that are expressed in the

6    Local Rules of Criminal Procedure, and the additional

7    condition that I've read to you during the course of this

8    hearing.

9         In returning to the sentence to be imposed in this

10   matter, the Court finds that a sentence that is sufficient

11   but not greater than necessary is one that takes into

12   account the thoughtful and compassionate sentiments that are

13   expressed in all these many letters that I have received,

14   and takes into account, as well, the exceptional number here

15   in your behalf today, which shows what great confidence and

16   faith these people have in you.

17        In doing that, I've concluded that a sentence that is

18   sufficient but not greater than necessary is one that is at

19   the bottom of the guideline range of 168 months.

20        And the Court will impose a sentence of 168 months,

21   along with the five-year term of supervised release.

22        There have been forfeited some $144,000 so far, as well

23   as the weapons.  The Court finds that that has apparently

24   stripped you of your assets.  The Court will not impose a

25   fine.

1        The $100 Special Assessment is imposed, but it's

2   already been paid.

3        And with that, I would ask the parties whether or not

4   you have anything further?

5             MR. WOLFE:  No, Your Honor.

6             MR. MOORE:  I'd ask the Court to reconsider the

7   sentence and give him no more than the mandatory minimum

8   necessary, Your Honor.

9             THE COURT:  There being nothing further, the Court

10  adheres to the sentence that it has imposed, and would note

11  to you, Mr. Jackson, that you have 14 days from today within

12  which to appeal your conviction and the sentence that the

13  Court's imposed.

14       And I believe, Mr. Moore, you've been retained.  Is

15  that correct?

16            MR. MOORE:  Volunteered, Your Honor.

17            THE COURT:  But, in any event, you are not

18  appointed counsel; is that correct?

19            MR. MOORE:  No, I'm not, Your Honor.

20            THE COURT:  And so, I would simply note to you

21  that, Mr. Jackson, that if you wish to appeal and are

22  without funds with which to engage counsel to do so, you may

23  apply to the Court to proceed without payment of counsel,

24  and appointed counsel will be designated for you.

25       The Court would note to you that you have 14 days from

1    this date within which to appeal the conviction and sentence

2    in this case.  And, again, if you're without funds with

3    which to engage an attorney for that purpose, then upon your

4    request, counsel will be appointed to represent you without

5    expense to you.

6         And with that, I would simply note to you that the

7    Court wishes you well.

8         Thank you.

9              THE CLERK:  All rise.

10        (Proceedings concluded at 4:01 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF OFFICIAL REPORTER

2     I, Catherine Schutte-Stant, Federal Official Realtime

3  Court Reporter, in and for the United States District Court

4  for the Southern District of West Virginia, do hereby

5  certify that, pursuant to Section 753, Title 28, United

6  States Code, the foregoing is a true and correct transcript

7  of the stenographically reported proceedings held in the

8  above-entitled matter and that the transcript page format is

9  in conformance with the regulations of the Judicial

10  Conference of the United States.

11          s/Catherine Schutte-Stant, RDR, CRR

12  _____     November 27, 2024

13          Catherine Schutte-Stant, RDR, CRR
           Federal Official Court Reporter

14

                    **REDACTION CERTIFICATE**

15

16  I certify that the foregoing is a true and correct copy of

17  the transcript originally filed with the Clerk of Court on

18  November 27, 2024, and incorporating redactions of personal

19  identifiers requested by the following attorney of record:

20  Jonathan D. Byrne, in accordance with Judicial Conference

21  policy.  Redacted characters/pages appear as a black box in

22  the transcript.  Date:  January 23, 2025.

23            /s/ CATHERINE SCHUTTE-STANT, RDR, CRR
           _____
24            CATHERINE SCHUTTE-STANT, RDR, CRR
           FEDERAL OFFICIAL COURT REPORTER
25